NORMAN AND ARLENE RODMAN, Et Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rodman v. Commissioner
Docket Nos. 5779-65, 5780-65, 5781-65, 5782-65, 5783-65, 5784-65, 5785-65, 5786-65, 2343-67, 2344-67, 2345-67, 3719-67, 3737-67, 3738-67, 3739-67, 4474-67, 4655-69.
United States Tax Court
T.C. Memo 1973-277; 1973 Tax Ct. Memo LEXIS 10; 32 T.C.M. (CCH) 1307; T.C.M. (RIA) 73277; December 19, 1973, Filed Philip Shurman, for the petitioners. Bernard Goldstein and Curtis W. Berner, for the respondent. 2 QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined the following deficiencies in income tax and additions to tax in these consolidated cases: Docket No.
Petitioners
Taxable Year
Deficiency
Additions to Tax Sec. 6653(b) [2]
5779-65
Norman Rodman and Arlene Rodman
1956
$346,147.86
$173,073.93
5780-65
Norman Rodman and Arlene Rodman
1957
134,103.82
67,051.91
4655-69
Norman and Arlene Rodman
1959
5,427.65
-
4474-67
Norman and Arlene Rodman
1960
146,527.22
73,263.61
4474-67
Norman and Arlene Rodman
1961
6,022.52
-
3719-67
Norman and Arlene Rodman
1962
1,329.82
-
$639,558.89
$313,389.45
5782-65
Martin Rodman and Phyllis Rodman
1956
$285,870.90
$142,935.45
5781-65
Martin Rodman and Phyllis Rodman
1957
134,766.78
67,383.39
3737-67
Martin and Phyllis Rodman
1959
7,660.00
-
3737-67
Martin and Phyllis Rodman
1960
147,099.00
73,549.50
3737-67
Martin and Phyllis Rodman
1961
694.48
-
2345-67
Martin and Phyllis Rodman
1962
4,081.58
-
$580,172.74
$283,868.34
5783-65
Estate of Robert Rodman, Deceased, Gertrude Rodman, Administratrix, and Gertrude Rodman
1956
$261,458.88
$130,729.44
5784-65
Estate of Robert Rodman, Deceased, Gertrude Rodman, Administratrix, and Gertrude Rodman
1957
135,690.86
67,845.43
*13 4 Additions to tax Docket No.
Petitioners
Taxable Year
Deficiency
3738-67
Estate of Robert Rodman, Deceased, Gertrude Rodman, Administratrix, and Gertrude Rodman
1960
$132,726.00
$ 66,363.00
-
2343-67
Estate of Robert Rodman, Deceased, Gertrude Rodman, Administratrix, and Gertrude Rodman
1962
2,853.80
-
-
$532,729.54
$264,937.87
5786-65
Estate of Sydney Newman, Deceased, Dorothy Clifford Newman, Executrix and Dorothy Clifford Newman
1956
$430,595.43
$215,297.71
-
5785-65
Estate of Sydney Newman, Deceased, Dorothy Newman, Executrix and Dorothy Newman
1957
237,241.90
118,620.95
-
3739-67
Estate of Sydney Newman, Deceased, Dorothy Newman, Executrix and Dorothy Newman
1959
9,249.92
-
$462.50
3739-67
Estate of Sydney Newman, Deceased, Dorothy Newman, Executrix, and Dorothy Newman
1960
$242,382.42
$121,191.21
-
3739-67
Estate of Sydney Newman, Deceased, Dorothy Newman, Executrix, and Dorothy Newman
1961
6,669.26
-
-
2344-67
Estate of Sydney Newman, Deceased, Dorothy Clifford Newman, Executrix and Dorothy Clifford Newman
1962
1,687.92
-
$ 84.40
$927,826.85
$455,109.87
$546.90
*14 Petitioners Norman Rodman, Martin Rodman, Robert Rodman and Sydney Newman were participants in a joint venture (hereinafter referred to as the "joint venture") on account of which partnership returns were filed for 6 the years 1955 through 1958. With respect to the joint venture, the principal questions presented for decision are: (1) Whether a purported noted in the amount of $900,000 made out to the order of one Aurele Brisson shall be included in the cost or basis of stock of Torbrook Iron Ore Mines, Ltd. (hereinafter referred to as "Torbrook") sold by the joint venture during the taxable year 1956. (2) In the event that said note in the amount of $900,000 is includable in determining the cost or basis for said stock, whether the joint venture or the petitioners, individually, realized any income either in the taxable year 1957 or in the taxable year 1960 on account of the cancellation of indebtedness. (3) Whether a contractual obligation in the amount of $120,000 payable to E. Crevier, R. Mongeau, and R. Robert shall be included in the cost or basis of the Torbrook stock sold by the joint venture during the taxable year 1956. 7 (4) Whether a payment of $250,000 *15 received by the joint venture from General Tire & Rubber Company constituted gain from the sale or exchange of a capital asset. (5) Whether the joint venture is entitled to deduct certain expenses for the taxable years 1956 and 1957 including those arising out of proceedings against Robert Rodman and Sydney Newman instituted by the Securities and Exchange Commission and the Attorney General of the State of New York. With respect to the individual petitioners, there are also presented the following issues for decision: (1) Whether the distributive share of the income of the joint venture taxable to Martin Rodman, petitioner in docket No. 5782-65, for the year 1956 shall be computed on the basis of the full taxable year 1956 or on the basis of the period from November 5, 1956 to December 31, 1956. 8 (2) Whether Norman and Arlene Rodman, petitioners in docket No. 4474-67, are entitled to dependency exemptions under section 151(e) for the taxable year 1960 on account of Robert and Gertrude Rodman. (3) Whether Martin Rodman, petitioner in docket No. 3737-67, and Norman Rodman, petitioner in docket No. 4474-67, are entitled to deductions for the taxable years 1959 and 1960 *16 on account of legal fees and payments made in connection with a judgment against Sydney Newman and Robert Rodman. (4) Whether petitioners, Arlene Rodman, Phyllis Rodman, Gertrude Rodman, and Dorothy Clifford Newman, are entitled to relief from liability for the deficiencies for any of the years involved herein under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. 9 Petitioners Norman and Arlene Rodman, Martin and Phyllis Rodman, Robert and Gertrude Rodman, and Sydney and Dorothy Cliffrd Newman were, respectively, husbands and wives at all times pertinent herein. Robert Rodman, father of Norman and Martin Rodman, died on September 29, 1968. Sydney Newman died on June 30, 1963. At the time of the filing of the petitions in these consolidated cases, the petitioners were all legal residents of the State of New York. With respect to petitioners Estate of Robert Rodman and Estate of Sydney Newman, who are represented herein by legal representatives, the residence for purposes of determining venue on appeal is the State of New York. In the taxable *17 year 1955, petitioners Sydney Newman, Robert Rodman, and Norman Rodman entered into the joint venture with Walter Ornstein (hereinafter referred to as "Ornstein"), each party receiving a 25 percent interest therein. Partnership returns on 10 account of the joint venture were filed on the accrual basis of accounting. Such returns were prepared by Norman Elliott (hereinafter referred to as "Elliott"), a Certified Public Accountant. During the year 1955, the activities of the joint venture were directed principally to the acquisition of control of A. M. Byers Co., Inc., a listed corporation. During the year 1956, the joint venture was engaged primarily in trading in the stock of Torbrook, Nova Scotia, Canada. Torbrook was incorporated in early 1956 to promote prospecting licenses issued by the Minister of Mines, Nova Scotia. A total of 1,900,000 shares of Torbrook were originally to be issued to Henri Leroux, Aurele Brisson, Sydney Newman, and various nominees for the following consideration: Shares
Consideration
900,000
Henri Leroux
Mining Licenses
500,000
Aurele Brisson
$ 100,000.00
100,000
Sydney Newman
125,000.00
100,000
Sydney Newman
200,000.00
100,000
Sydney Newman
250,000.00
135,485
Sydney Newman
406,455.00
64,515
various nominees
13,247.34
1,900,000
$1,094,702.34
*18 11 The record fails to establish whether Aurele Brisson, a Montreal attorney, exercised his right to subscribe to 500,000 shares of the stock of Torbrook or whether such right was transferred to the joint venture prior to its exercise. In any event, during the year 1956, the joint venture acquired and had available for sale a total of 1,179,050 shares of such stock at a cost of $1,846,182.73, exclusive of the amounts herein in dispute. [3] During the taxable year 1956, the joint venture sold 835,055 shares of Torbrook stock to the public on account of which the joint venture realized a total of $2,574,903.34. 12 In May 1956, Aurele Brisson agreed to sell to Robert Rodman, as agent for the joint venture, the 500,000 shares of Torbrook stock to which Brisson was entitled *19 for a stated consideration of 21 cents a share and the further consideration that the joint venture would transfer to Brisson, without cost, 20 percent of any additional shares of Torbrook stock which the joint venture might acquire. The aforesaid agreement between Brisson and the joint venture first came to the attention of Elliott, accountant for the joint venture, in September 1956. Due to the ambiguity or open-ended nature of the provision for the 20 percent interest, Elliott suggested that a liability in the amount of a fixed sum be substituted. Elliott was concerned with respect to the difficulty in interpreting the commitment if taken literally and to the tremendous cost that might result on the 13 volume of transactions contemplated by the joint venture. He was requested to draft a substitute, and submitted the following: Dear Mr. Brisson: By agreement last May, I undertook to transfer to you, without cost, twenty percent (20%) of any additional shares of the capital stock of Torbrook Iron Ore Mines Limited which I might acquire in addition to the shares sold by you to me, and further subject to any escrow agreements restricting our receipt or possession of the *20 shares. We have since acquired, including the rights to purchase Leroux stock in escrow, approximately 1,400,000 shares of which 900,000 has not as yet actually been stock available to us. You know, and we know that problems of mining, company control and general money requirements to see Torbrook off to a really good start may take as much as four years. We therefore wish you to cancel that agreement, and instead, accept a non-interest-bearing note for $900,000 from us, with a due date of November 15, 1960. We agree to advance you sums of money from time to time, at our discretion and within our financial means, in partial and earlier payment of this note, and will settle any remainder on the final due date specified. 14 On your part, and in return for this settlement, you agree not to purchase or sell shares of Torbrook Iron Ore Mines Limited during that period and to do nothing that would prejudice the position of that company or ourselves with respect to the market position of that company's stock, or its finances or ours, and that you will not in any way profit, directly or indirectly, from that company's operations or dealings except upon our express written prior *21 consent. Any violation of this undertaking, however trivial, shall operate to cancel the unpaid balance of the note. We herewith hand you the note and request that you indicate your acceptance of the above terms and the note by your signature below. Very truly yours, /s/ Robert Rodman Robert Rodman, as agent for himself and associates Accepted: /s/ A. Brisson A. Brisson In May of 1957, Elliott received the draft of the proposed agreement, signed and dated November 3, 1956, together with a photocopy of a purported note 15 dated November 3, 1956, whereby Robert Rodman (on behalf of the joint venture) promised to pay to the order of Aurele Brisson, on or after November 15, 1960, the sum of $900,000. On the basis of the agreement and copy of the note, Elliott thereupon accrued the sum of $900,000, as part of the cost of the Torbrook stock to the joint venture. [4] As a result, the partnership income tax return for the taxable year 1956 reflected an ordinary loss on the sale of the Torbrook stock in that year. Each of the petitioners claimed his distributive share of such loss on his 1956 individual return. *22 16 The following letter from Aurele Brisson was found in the effects of Sydney Newman at his death: Jan. 7 1957 Mr. Robert Rodman Agt. 40 W. 57th St. New York City, N.Y.
Dear Sir: This letter will acknowledge receipt this day from Mr. Robert Rodman of 200,000 shares of Torbrook Iron Ore Mines Ltd. common stock. These shares represent full and final payment of note made from Robert Rodman to the undersigned in the amount of $900,000.00, and dated the 3rd day of November, 1956. Very truly yours, /s/ Aurele Brisson Montreal, Quebec
Jan. 7 1957 Petitioners concede that 200,000 shares of Torbrook mentioned above were never delivered to Brisson. Petitioners did not introduce any evidence at trial to show that either the original or the 17 amended agreement with Aurele Brisson was bona fide or that the joint venture intended it to be a bona fide obligation. Nor did the petitioners show that the note was ever delivered to Brisson or subsequently satisfied. The original of the note was found in the personal effects of Sydney Newman by the attorney of his estate. When Ornstein withdrew from the joint venture on November 2, 1956, he had never heard of *23 Aurele Brisson or of any obligation which the joint venture might have had toward him. Upon Martin Rodman's entry into the joint venture on November 5, 1956, he was unaware of any signficiant liabilities which the joint venture might have had outstanding against it. With further reference to the basis for Torbrook stock, Sydney Newman, as agent for Robert Rodman, Norman Rodman, Walter Ornstein and himself ("the American Investors"), entered into an option agreement, dated May 25, 1956, with Rene Mongeau, Etienne Crevier 18 and Roger Robert of Montreal ("the Canadians") which, in pertinent part, provided as follows: NOW THEREFORE IT IS AGREED: 1. That the Canadians may jointly call upon the American Investors to sell to them a total of 60,000 shares of the comon stock of Torbrook Iron Ore Mines, Ltd., or any smaller part thereof at $2.75 per share at any time during the twelve months ended May 31, 1957; 2. That in return, the Canadians agree to pay to the American Investors the sum of $.50 (fifty cents) per share for such of the shares they purchase below the total of 60,000 during the period stated, such payment to be settled on or before May 31, 1957; 3. That all *24 payments specified hereunder shall be made in Canadian funds without adjustment for exchange, and 4. That the terms and conditions hereof shall be binding upon all the parties hereto, including the American Investor principals, jointly and severally and upon their respective heirs, successors and assigns. On July 5, 1956, Sydney Newman, as agent for the "American Investors" (supra), entered into a subsequent agreement with the "Canadians" (supra) 19 whereby the American Investors repurchased for the sum of $120,000 the option given to the Canadians under their prior agreement. The new agreement provided, in pertinent part, as follows: 2. The American Investors wish to repurchase from the Canadians all their rights under the aforementioned option agreement which was granted on May 25, 1956 in a writing confirming previous oral negotiations and arrangements, and the Canadians do hereby agree to sell their rights thereunder for the sum of $120,000.00 payable on account at least once monthly on the 15th day during the twelve months ended June 30, 1957; the payments to be at amounts by common consent during the first six months, at a minimum of $7,500.00 monthly during January, *25 February, and March 1957, at a minimum of $10,000.00 monthly during April, May and June, 1957, and the balance on June 30, 1957 * * *. * * * 4. The Americans agree that if they or anyone or more of them shall in one single transaction sell or otherwise dispose of the whole or a major part of their then interests in Torbrook Iron Ore Mines Ltd [sic] they shall, immediately upon such sale or disposition, pay to the Canadians five percent (5%) of the net gain made. 20 Elliott received a copy of the July 5, 1956 agreement in the spring of 1957 while he was in the process of trying to reconstruct the activities of the joint venture in 1956 for tax purposes. Elliott directed the accrual of the $120,000 obligation to the Canadians as part of the cost of the Torbrook stock to the joint venture. The following payments were made to the Canadians in 1956: Payor
Payee
Rodorn, Inc.
Robert Rodman, Agent
9/13/56
Mongeau
$10,000
9/13/56
Mongeau
20,000
10/5/56
Robert
740
10/5/56
Mongeau
1,480
10/5/56
Crevier
1,480
10/18/56
Crevier
$ 2,000
10/18/56
Robert
1,000
10/18/56
Mongeau
2,000
12/28/56
Mongeau
4,000
12/28/56
Robert
2,000
12/28/56
Crevier
4,000
12/28/56
Crevier
10,000
Totals
$33,700
$25,000
*26 21 Rodorn, Inc., is a closely-held corporation whose principal shareholders were Sydney Newman and Robert Rodman. Rodorn, Inc., was reimbursed for its payments by the joint venture. Respondent has disallowed $91,300 of the $120,000 obligation which the joint venture accrued as a part of the cost of its Torbrook stock. During 1955, the joint venture attempted to acquire control of A. M. Byers Co., Inc. (hereinafter referred to as "A. M. Byers Co."), a publicly traded corporation. It engaged in a proxy fight with General Tire & Rubber Company (hereinafter referred to as "Genral Tire") and eventually lost, having incurred a total of $380,677.23 in proxy expenses. On July 3, 1956, Sydney Newman and Norman Rodman, as agents for the joint venture, entered into an agreement with General Tire which provided, in pertinent part, as follows: WHEREAS, the Shareholders [the joint venture] own or control 25,000 share of Common Stock of A. M. Byers Company ("the Shares"), a Pennsylvania corporation ("Byers"), and 22 WHEREAS, the Company [General Tire] is contemplating making an offer to holders of Common and Preferred Stock of Byers and the Shareholders are willing as hereinafter *27 set forth to agree to deposit or cause to be deposited the Shares in acceptance of such offer by the Company, and WHEREAS, the Shareholders have informed the Company that they claim reimbursement against Byers for approximately $380,000 which they represent to have been expended by them in connection with solicitation of proxies and other matters relative to meetings of shareholders of Byers, and WHEREAS, the Shareholders own or control all of the right, title and interest in a certain pending United States patent application with respect to a rubber bellows pump which the Company desires to acquire, NOW, THEREFORE, in consideration of the mutual promises and convenants and the performance of the acts herein provided for, it is agreed as follows: 1. The Shareholders agree to deposit or cause to be deposited as hereinafter set forth the Shares in acceptance, if made, of an offer by the Company to acquire Common Stock of Byers, if such offer is made to holders of Common Stock of Byers on or before October 1, 1956, provided that such offer includes, among others, the following terms and conditions: (a) The exchange of the Company * * * of one share of its Cumulative Preference *28 Stock (par value $100 per share) and 23 a warrant to purchase one share of its Common Stock for each 3-1/3 shares of Common Stock of Byers, provided that if an aggregate of at least 100,000 shares of Byers Comon Stock is deposited pursuant to such offer * * * the exchange ration shall be one share of Cumulative Preference Stock and a warrant to purchase one share of Common Stock for each three shares of Byers Common Stock deposited. * * * 2. * * * The Shareholders agree that they will as soon as practicable issue irrevocable written instructions to such banks or brokerage firms directing each of them to execute and deliver, within 10 days after the above offer of the Company is made, a Letter of Transmittal in the form supplied by the Company, consistent with this Agreement, accepting the exchange offer with respect to the number of shares of Byers Common Stock in the custody of each such bank or brokerage firm, and to deliver such shares to the First National City Bank of New York, The Exchange Agent acting on behalf of the Company, against delivery of the securities to be issued by the Company in exchange therefor. * * * 4. The Shareholders hereby assign, and have *29 caused to be delivered herewith assignments by other persons of, all of the right, title and interest of the Shareholders and such persons in and to pending United States patent application number 363,362 (filed June 22, 1953 by James J. Sunday and assigned on August 7, 1953 to Sydney Newman, such assignment 24 being recorded on August 10, 1953 in the U.S. Patent Office, Liber A237, at page 307) with respect to a rubber bellows pump, a copy of which application and information relating thereto have been delivered to the Company, and the Shareholders represent that no other persons own any right, title or interest in and to such application. The Shareholders each further agree to execute and cause to be executed any and all documents deemed necessary by the Company effectively to assign to it the above-mentioned application and patent issued as a result thereof and to cooperate fully in the prosecution thereof. 5. The Shareholders for themselves and their heirs, administrators, executors, and assigns hereby assign and transfer to the Company all the right, title and interest in and to any and all claims which they or either of them may have to claim to have against Byers arising *30 out of expenditures relating to the solicitation of proxies in connection with meetings of shareholders of Byers or otherwise to the date hereof. 6. The Shareholders agree that they will not, for a period of five years from the date hereof, directly or indirectly acquire any shares of capital stock or other securities of Byers and that they will take no action in any manner whatsoever to delay, hinder, or interefere with the consummation of the above described offer of the Company. 7. The Company agrees, within three business days after the receipt of executed letters, in the form attached hereto as Exhibit C, from the Banks and brokerage firms referred to in paragraph 2 hereof 25 and covering all of the Shares, to pay to Sydney Newman and Norman Rodman jointly the aggregate sum of $250,000; and such payment of $250,000 (except as stated in the next sentence) shall not be refundable to the Company even though the offer referred to in paragraph 1 is not made by the Company or does not become effective. In the event that the exchange ratio with respect to the offer referred to in paragraph 1 shall be one share of Cumulative Preference Stock and a warrant to purchase one *31 share of Common Stock for each three shares of Byers Common Stock deposited, the Shareholders severally and jointly agree to pay to the Company on ten days notice the aggregate amount of $25,000. Having provided General Tire with the executed letters as required under paragraphs 2 and 7 of the above agreement, the joint venture received a payment of $250,000 from General Tire on July 17, 1956. The exchange ration under paragraph 1(a) of the agreement was implemented, and in September 1956, the joint venture transferred 550 shares of common stock of A. M. Byers Co., in settlement of its obligation to pay General Tire $25,000 under paragraph 7. The fair market value of the 550 A. M. Byers Co. shares transferred to General Tire was $14,041.93. 26 On its 1956 return, the joint venture reported $187,500 of the General Tire payment as long-term gain from the "sale of pump." The additional $62,500 was credited on the books of the joint venture to the account of Ornstein as a transaction completed prior to his withdrawal from the joint venture on November 2, 1956. The patent application for the rubber bellows pump (No. 363362) was first filed on June 22, 1953, with the United *32 States Patent Office, United States Department of Commerce. The application was rejected and restricted on April 28, 1954, and an amendment was filed on October 28, 1954. On April 17, 1956, the application was rejected and an amendment was again filed on October 26, 1956. The application was finally rejected on December 6, 1956. On June 5, 1957, another amendment was filed. A notice of claim allowance, subject to payment of final filing fees was mailed on June 12, 1957, with respect to 6 of the 17 claims. On December 12, 1957, the patent application was forfeited for failure to pay the final filing fees. 27 No evidence was introduced by petitioners as to the value, if any, of the patent application. Respondent has allocated the entire amount of the consideration received from General Tire to the agreement by the joint venture not to oppose General Tire's offering for the stock of A. M. Byers Co.
In its 1956 partnership return, the joint venture claimed a sales expense deduction of $124,804.19 and a travel and investigation deduction of $9,445.56. Respondent has disallowed the full amount of the sales expense deduction and $6,685.73 of the claimed travel and investigation *33 deduction for lack of substantiation. The petitioners were unable to present any evidence in substantiation of such deductions. In its 1957 partnership return, the joint venture claimed a sales expense deduction of $40,793.90 of which respondent has disallowed $40,276.38 for lack of substantiation. The amount allowed consists of $18.93 of brokerage expenses to E. H. Pulle and Co., $437.16 of brokerage expenses to Mathieson, a bank charge of $1.85 28 and sundry charges of $69.58. [5] The amount disallowed consists of the following items: Date
Book of Entry
Description
Amount
1/4/57
Cash Disbursements Page 5
B. C. Eckhardt
$ 1,103.32
1/2/57
Cash Disbursements Page 5
Maurice Shulman
25,000.00
1/31/57
Cash Disbursements Page 6
John Sinclair
7,221.04
1/10/57
Cash Disbursements Page 6
Max Hamburger
4,568.18
Page 32
Payment to Leroux
2,340.00
Page 1
Sundry Expenses
43.84
$40,276.38
*34 The petitioners were unable to present any evidence in substantiation of the $40,276.38 listed above. The joint venture claimed travel and investigation deductions of $7,688.98 in its 1957 return, all of which has been disallowed by respondent for lack of substantiation. The following is a list of the payments 29 claimed by the joint venture as part of its travel and investigation expense: Date
Payor
Payee
Amount
4/24/57
Robert Rodman
Regency Towers
$ 44.05
4/26/57
Robert Rodman
Royal York Hotel
90.40
5/8/57
Robert Rodman
King Edward Sheraton
200.00
5/9/57
Robert Rodman
King Edward Sheraton
220.97
5/15/57
Robert Rodman
Windsor Hotel
200.00
6/14/57
Robert Rodman
Lord Simcoe Hotel
120.00
6/21/57
Robert Rodman
Cash
100.00
8/1/57
Robert Rodman
Lord Simcoe Hotel
120.00
8/16/57
Robert Rodman
Cash
300.00
8/16/57
Robert Rodman
Cash
300.00
9/6/57
Robert Rodman
H. LaRue
100.00
10/1/57
Robert Rodman
Hotel Lord Simcoe
103.38
10/4/57
Sydney Newman
Cash
5.32
10/5/57
Robert Rodman
Hotel Lord Simcoe
100.00
10/8/57
Robert Rodman
Hotel Lord Simcoe
50.00
10/9/57
Robert Rodman
Hotel Lord Simcoe
50.00
10/14/57
Sydney Newman
Price & Savin
178.10
10/19/57
Robert Rodman
Lord Simcoe Hotel
100.00
10/24/57
Robert Rodman
Cash
200.00
11/4/57
Robert Rodman
Cash
500.00
11/9/57
Robert Rodman
Hotel George V
242.50
11/13/57
Sydney Newman
Cash
335.00
12/21/57
Robert Rodman
Hotel George V
82.00
TOTAL
$3,741.72
*35 The petitioners were unable to present any evidence in substantiation of the amounts claimed including the $3,741.72 listed above. 30 In its 1957 partnership return, the joint venture claimed a deduction of $2,700 as commission expense, all of which was disallowed. Included as part of this disallowance was a payment in the amount of $1,000 made June 28, 1957, to R. R. Man - (name illegible). The joint venture also claimed legal and accounting expenses of $64,053.88, of which $61,117.88 has been disallowed. The petitioners were unable to present any evidence in substantiation of the amounts disallowed by the respondent. The petitioners claimed that the joint venture is entitled to deduct an $8,000 check, dated October 9, 1957, and payable to J. B. Monier as representing the cost of an option on certain oil property which was carried on the joint venture books as an asset as of December 31, 1957. This item was not claimed by the joint venture on its 1957 return. No proof of worthlessness was submitted by the petitioners. On March 19, 1957, the Securities and Exchange Commission obtained a judgment by consent to the entry of a permanent injunction by the U.S. District *36 Court 31 for the Southern District of New York whereby Sydney Newman and Robert Rodman were permanently enjoined from trading in Torbrook stock unless and until said stock was registered with the Commission. At the time, Sydney Newman and Robert Rodman were trading Torbrook stock on behalf of both the joint venture and Rodorn, Inc., in which they were major shareholders. Leonard E. Russack represented Sydney Newman and Robert Rodman in this proceeding. During 1957, Norman Rodman drew certain checks in the amounts of $7,500, $5,000, and $10,000 payable to Leonard E. Russack for legal services on behalf of Sydney Newman and Robert Rodman in the aforementioned proceeding. The legal fees paid to Leonard E. Russack were properly deductible as an expense of the joint venture in the taxable year 1957. Walter Ornstein, an original member of the joint venture when it was first formed in 1955, withdrew from the joint venture pursuant to an agreement dated November 2, 1956, in which he sold his interest to the 32 three remaining joint venturers, Norman Rodman, Robert Rodman, and Sydney Newman. Pursuant to an agreement dated three days later on November 5, 1956, Martin Rodman (hereinafter *37 referred to as "Martin") became a partner in the joint venture. The interest of each of the parties in the joint venture was stated to be as follows: Sydney Newman, 33-1/3 percent; Robert Rodman, 22-2/3 percent; Norman Rodman, 22 percent; and Martin Rodman, 22 percent. Martin testified that there was no discussion of his participation in the profits and losses of the joint venture prior to his signing the November 5, 1956 agreement. It was his understanding that he was to assume his share of the profits and losses from this time forward. The agreement, however, does not provide any limitation on his interest. Prior to becoming a partner in the joint venture, Martin had assisted the joint venture on several occasions at the request of his father. In 1955, he quit his job at D. Mendelsohn, Inc., where he was 33 earning $9,000 annually, to help the joint venture in its proxy fight for control of A. M. Byers Co. He was assured by his father that he would get a job at Byers if control of Byers was won. His father said he could sustain him in the meantime and felt he should take the chance.The proxy fight, however, was lost in early 1956. During 1955 and 1956, Martin also *38 worked at a plant of Rodorn Manufacturing Corp., which was controlled by the joint venture. The plant manufactured and repaired 4.2 mortar shells for the government, but was not operative at this time. However, under the government contract it had, the plant had to be kept in working order in case the need for mortar shells should ever arise. Martin did not receive compensation from the joint venture during this time for either his services at the plant or for his help in the proxy fight. His father, however, gave him money as he needed it, and he borrowed some money from his father-in-law. He also drew on his savings. 34 In 1956, he performed various services at the request of his father for the joint venture with respect to its activities in Torbrook stock. He made a trip to Nova Scotia to deliver some papers which were necessary to list the stock on the Calgary Stock Exchange. In September of 1956, he went to Montreal to take over the operation of a Telex machine for his father who was called away to Europe on business. The Telex machine was connected to the stock exchange at Calgary, and it was his job to relay information to Sydney Newman in New York. In its partnership *39 return for the taxable year 1956, the joint venture attributed 2/9ths of the loss for said year to Martin. Martin correspondingly included 2/9ths of said loss on his individual return for 1956. The return of the joint venture also allocated to Martin 2/9ths of the net long-term capital gains incurred during the year 1956, including the $187,500 gain attributable to the agreement of July 3, 1956 with 35 General Tire & Rubber Co. [6] He reported his 2/9th share of such amount in his individual return. The other partners also reported their respective distributive shares of the joint venture income and loss for 1956 in accordance with the partnership return. Petitioners Norman and Arlene Rodman claim dependency exemptions for Robert and Gertrude Rodman for 1960. Robert and Gertrude Rodman did not file *40 a Federal income tax return for the taxable year 1960. Respondent concedes that the aforesaid petitioners are entitled to claim the dependency exemptions provided that the facts with respect to the $900,000 note of Aurele Brisson do not establish the realization of income by Robert Rodman in the year 1960 on account of the cancellation of indebtedness income. 36 Sydney Newman and Robert Rodman engaged the firm of Unger & Martin for the purpose of finding oil-producing properties suitable for purchase by Torbrook. Unger & Martin brought to their attention certain properties which were subsequently purchased by Torbrook. The agreed finder's fee, however, was never paid. Unger & Martin brought an action against Sydney Newman and Robert Rodman to recover the finder's fee and secured a judgment against them individually. Emanuel Silverman represented Sydney Newman and Robert Rodman in the action. Martin Rodman did not assume Sydney Newman's obligation under the Unger & Martin judgment. However, he assumed Robert Rodman's obligation on the judgment and made the following payments in connection therewith in 1959 and 1960. Year
Payee
Total Amounts
1959
Emanuel Silverman
$7,383.33
Irving Trust Co. (Unger & Martin)
2,266.66
1960
Emanuel Silverman
316.66
Unger & Martin
7,666.66
*41 37 Of the sum of $7,383.33 paid to Emanuel Silverman in 1959, $1,050 is attributable to legal services, and $6,333.33 is attributable to the judgment. On his individual income tax return for the taxable year 1959, Martin Rodman claimed a deduction in the amount of $1,050 for legal fees paid to Emanuel Silverman and in the amount of $8,999.99 paid on account of the Unger & Martin judgment in the year 1959. [7] On his 1960 return, he claimed $7,695.85 as his distributive share of the total joint venture loss for 1960 which was stated to be $14,191.85. The total loss figure for the joint venture included the $7,983.32 which Martin paid in 1960 with respect to the Unger & Martin judgment. On his individual income tax return for the taxable year 1960, Norman Rodman claimed $6,496 as his share of the total joint venture loss for 1960, a part of which was attributable to the Unger & Martin judgment. 38 Petitioners have failed to present any evidence to show that *42 any of petitioners Arlene Rodman, Phyllis Rodman, Gertrude Rodman or Dorothy Clifford Newman are entitled to relief under the provisions of section 6013(e) for any of the taxable years before the Court to which it might apply. OPINION At the outset, there is the question whether the joint venture properly deducted the sum of $900,000 as a part of the cost of the stock of Torbrook sold during the taxable year 1956. Admittedly, the sum was never paid. The petitioners contend, however, that by reason of a certain agreement an obligation arose which was properly accrued in that year. The respondent disputes this. In order to properly accrue the liability in question, the burden rested on the petitioners to establish that there was an unconditional obligation 39 to pay one Aurele Brisson the sum of $900,000 as of the close of the taxable year 1956. United States v. Anderson, 269 U.S. 422 (1926). The petitioners have failed to meet that burden. Even if we accept the documents presented at face value, and there was no means of authenticating any of them, the obligation of the joint venture to Aurele Brisson was wholly contingent. Whatever agreement the joint *43 venture may have had with Brisson was changed at will. A letter dated January 7, 1957, from Brisson acknowledging receipt of 200,000 shares of the Torbrook stock in payment of the obligation misrepresented the facts. If anything is clear from this record, it is that there was at no time a definitive obligation to Brisson upon which to predicate the accrual of a liability on the part of the joint venture. Accordingly, the disallowance by the respondent of the accrual of $900,000 as a part of the cost of the Torbrook stock sold during the taxable year 1956 is sustained. 40 A different situation exists with respect to the sum of $120,000 accrued as a liability to Crevier, Mongeau, and Robert as a part of the Torbrook stock sold in the taxable year 1956. Substantial payments were made on this account during 1956, only a portion of which has been allowed by the respondent. A total of $20,000 was paid as late as December 28, 1956. While payment of the full amount was prevented by developments in the subsequent year, as of the close of the taxable year 1956 there was no basis to conclude that the balance due would not be paid. See Edward L. Cohen, 21 T.C. 855 (1954). *44 Accordingly, in our opinion the amount was properly accrued in the first instance and should be reflected as a part of the cost of the Torbrook stock sold during the taxable year 1956. With respect to the transaction with General Tire, it appears that the joint venture had proxies to vote some 25,000 shares of common stock of A. M. Byers Co. The joint venture had unsuccessfully attempted to gain control of that company, claiming to have expended some $380,000 for 41 that purpose. General Tire was interested in acquiring control of A. M. Byers Co. Thereupon, an agreement was entered into between the joint venture and General Tire whereby General Tire paid the sum of $250,000 to the joint venture for the stated consideration of (1) an agreement by the joint venture not to oppose a proposal by General Tire for the acquisition of control of A. M. Byers; (2) an assignment by the joint venture of its claims for proxy expenses; and (3) an assignment by the joint venture of its rights to certain pending patent applications with respect to a rubber belows pump. The petitioners claimed that the resulting gain of $250,000 should be treated as a long-term capital gain from the sale *45 of the patent application. However, the petitioners failed to present any evidence that the patent application had any value. While some part of the payment may, in fact, have been allocable to the patent application, in the absence of such proof there is no basis upon which this Court can make any allocation. In their brief, petitioners raised for the first 42 time the additional argument that a portion of the payment was attributable to the exercise by General Tire of its option under the agreement to purchase 25,000 shares of A. M. Byers owned by the joint venture and as such should be treated as capital gain. Again, however, petitioners, failed to show what portion of the payment, if any, was allocable to such an option. The determination of the respondent must, therefore, be sustained. We also hold that it was entirely proper for the joint venture to allocate to Ornstein 25 percent of the $250,000 payment since the resulting gain had been fully earned and accrued prior to his withdrawal. See section 1.706-1(c) (2) (ii), Income Tax Regs.
The final matter with respect to 1956 involves the deduction by the joint venture of sales expenses of *46 $124,804.19 and travel and investigation expenses of $9,445.56. Respondent has disallowed the full amount of the sales expense deduction and $6,685.73 of the claimed travel and investigation deduction for lack of substantiation. Since petitioners have failed to present any evidence in support of such claimed deductions, the determination of the respondent must be sustained. 43 With respect to the taxable year 1957, the respondent disallowed for lack of substantiation alleged payments by the joint venture to certain named individuals in the sum of $40,276.38, travel and investigation deductions of $7,688.98, commission expense of $2,700, and legal and accounting expenses of $61,117.88. Since no evidence was presented with respect to such deductions, the determination of the respondent must be sustained. With respect to the taxable year 1957, it is also claimed that the joint venture is entitled to deduct the sum of $8,000 on account of a check dated October 9, 1957, payable to one J. B. Monier as the cost of an option on certain oil property which was carried as an asset as of December 31, 1957. The amount was not claimed as the deduciton in the return for that year and *47 no proof of worthlessness was submitted. Accordingly, the petitioners claim with respect to this item must be rejected. 44 Finally, with respect to the taxable year 1957, there is in question certain payments aggregating $22,500 to Leonard E. Russack who represented Sydney Newman and Robert Rodman in a proceeding brought by the Securities and Exchange Commission whereby they were enjoined from trading in the Torbrook stock. The amount in question constituted an allowable expense of the joint venture in the taxable year 1957. Turning now to questions involving the individual petitioners we must first determine whether the distributive share of Martin Rodman in the income of the joint venture for the taxable year 1956 is to be computed from the period beginning with his entry into the joint venture on November 5, 1956, and ending December 31, 1956, or on the basis of the full taxable year. A joint venture is treated as a partnership for tax purposes. Section 761(a). The provisions applicable to partners and partnerships are found in Subchapter K. 45 Neither party has raised section 704(e) despite its apparent applicability. We therefore decline to consider the *48 issue. Instead we must proceed on the assumption that the transfer of a 22 percent interest in the joint venture to Martin Rodman was a bona fide arm's length transaction. Section 702(a) requires a partner to take into account his distributive share of partnership income in determining his personal income tax. Section 704(a) provides that a partner's distributive share of partnership income is determined, except as otherwise provided, by the partnership agreement. Section 761(c) provides that the partnership agreement "includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement." The effect of the modification is that it relates back 46 to the beginning of the taxable year. David A. Foxman, 41 T.C. 535 (1964).This permits the partners to adjust among themselves their shares of the earnings and to be taxed accordingly. The present venture in our case was formed in 1955 by Ornstein, Newman, Robert *49 Rodman, and Norman Rodman, each having an equal interest of 25 percent. The joint venture operated under this arrangement until November 2, 1956, when Ornstein withdrew by sale of his interest to the remaining venturers. Martin Rodman was admitted to the joint venture 3 days later under an agreement dated November 5, 1956. His interest in the joint venture was stated to be 22 percent. The interests of Sydney Newman, Robert Rodman, and Norman Rodman were 33-1/3 percent, 22-2/3 percent, and 22 percent, respectively.
Respondent contends that it was the intention of the parties under the November 5, 1956 agreement to retroactively amend the joint venture agreement to allow Martin Rodman to share in the full year's profits 47 and losses of the joint venture. He points to the partnership return for 1956 in support of this contention. Martin Rodman, on the other hand, testified that it was the intention of the parties to have his share of the profits and losses of the joint venture begin with his entry thereto. In the partnership return, Martin Rodman was allocated 22 percent of the losses of the joint venture for the full year 1956, in addition to his share of the net long-term *50 capital gains covering the same period. He filed his individual return on that basis. The loss reported by the joint venture has been wiped out by virtue of our determination above that the $900,000 note to Aurele Brisson was incorrectly included in the joint venture's cost of goods sold. Respondent would tax Martin on the same proportionate share of such income. We are compelled to agree with respondent. In the face of the partnership return, we are unable to accept Martin Rodman's statement that the other partners intended only to have him share in the profits and losses 48 of the joint venture from the date of his entry. Both Martin Rodman and the other partners clearly reflected their understanding of the agreement by reporting their respective distributive shares of the joint venture's income and loss in accordance with the partnership return.There was never any suggestion by Martin Rodman that the understanding of the parties with respect to the November 5, 1956 agreement was ever altered between that date and the filing of the partnership return. In accordance with the above, we hold that Martin Rodman must compute his distributive share of the joint venture items *51 described in section 702(a) on the basis of the full taxable year. The items described in section 702(a), however, must first be reduced by any amount attributable to the withdrawing partner, Ornstein, under section 706(c) (2) (A) (i). With respect to the Unger & Martin judgment, we find that neither Martin Rodman nor Norman Rodman are entitled to the deductions as claimed for the taxable years 1959 and 1960. 49 The petitioners contend that the amounts paid in such years by Martin Rodman in connection with the Unger & Martin judgment were made pursuant to an obligation of the joint venture and that the deductions claimed should be accordingly allowed. The record, however, fails to adequately establish that the judgment was an obligation of the joint venture. The hiring of Unger & Martin by Robert Rodman and Sydney Newman appears to have been initiated on behalf of Torbrook instead of the joint venture. This conclusion is supported by the fact that Torbrook was the subsequent purchaser of the oil-producing properties found by Unger & Martin. Moreover, the scope of the joint venture was limited to the investment in certain designated securities. There is no basis for us *52 to conclude that the scope of the joint venture was extended to encompass the activities of Robert Rodman and Sydney Newman with respect to Unger & Martin. Even if we assumed, however, that the judgment was an obligation of the joint venture, the petitioners' claims must still be denied. The joint venture was on the accrual 50 basis of accounting. Despite the fact that the petitioners were cash basis taxpayers, they are bound by the joint venture's method of accounting in reporting their distributive share of a particular item of income or expense. Melville W. Thompson, 18 B.T.A. 1192 (1930); sections 702 and 706(a). Since the record fails to establish either the total amount of the liability or the taxable year in which such liability accrued to the joint venture, the petitioners' deduction must be denied. Section 1.461-1(a) (2), Income Tax Regs.
With respect to whether petitioners Norman and Arlene Rodman are entitled to dependency exemptions under section 151(e) for Robert and Gertrude Rodman for the taxable year 1960, respondent has conceded that such exemptions are allowable if Robert Rodman had no cancellation of indebtedness *53 income for 1960 as a result of the $900,000 note to Aurele Brisson. Our determination above that the $900,000 note was incorrectly included by the joint venture in its cost of goods sold in 1956 precludes any finding of 51 cancellation of indebtedness income to Robert Rodman in 1960. Petitioners are therefore entitled to the exemptions as claimed. The final issue for our determination is whether petitioners Arlene Rodman, Phyllis Rodman, Gertrude Rodman and Dorothy Clifford Newman are entitled to relief from liability under section 6013(e) for any of the years to which such section applies. Section 6013(e) provides certain conditions under which an innocent spouse will be relieved of any income tax liability attributable to an omission from gross income by the other spouse of an amount in excess of 25 percent of the amount of gross income stated in the joint return. When section 6013(e) speaks of a 25 percent omission from gross income, it does not refer to an omission from gross income which results from an error in computing the cost of goods sold. Section 6013(e) (2) (B) incorporates the rules of section 6501(e) (1) (A) in determining whether a 25 percent 52 omission *54 has been made, and under section 6501(e) (1) (A) (i), an error in the cost of goods sold is not the equivalent of an omission from gross income within the meaning of such term. See Colony, Inc. v. Commissioner, 357 U.S. 28 (1958). The characterization of "gross income" on the partnership level is determinative of "gross income" on the partner level since the partnership return must be read as an adjunct with an individual partner's return in determining the total gross income stated in the individual's return. L. Glenn Switzer, September 17, 1954, remanding per stipulation 20 T.C. 759 (1953); Nadine I. Davenport, 48 T.C. 921 (1967). Thus, although our determination that the $900,000 note to Aurele Brisson was improperly included in the joint venture's cost of goods sold in 1956 effective increased the gross income of petitioners for such year, such increase in not due to an omission from gross income within the meaning of section 6013(e). 53 None of the other years before the Court involve a 25 percent omission. Accordingly, we hold that petitioner wives are not entitled to relief under section 6013(e) for any of the years involved. *55 Finally, even if there had been an omission of 25 percent of gross income in any of the years involved, the petitioner wives have failed to establish that they meet the other prerequisites of section 6013(e). Accordingly, we are unable to grant them relief under that section. Jerome J. Sonnenborn, 57 T.C. 373 (1971); Nathaniel M. Stone, 56 T.C. 213, 337 (1971). Decision will be entered under Rule 50. Footnotes
1. The cases of the following petitioners are consolidated herewith: Martin and Phyllis Rodman, docket Nos. 5781-65, 5782-65, 2345-67, 3737-67; Estate of Robert Rodman, deceased, Gertrude Rodman, Administratrix, and Gertrude Rodman, docket No. 5783-65, 5784-65, 2343-67, 3738-67; Estate of Sydney Newman, deceased, Dorothy Clifford Newman, Executrix and Dorothy Clifford Newman, docket Nos. 5785-65, 5786-65, 2344-67, and 3739-67.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. The parties have agreed that 900,000 of the Torbrook stock was placed in escrow. There is no accounting for the difference between the remaining 1 million shares of such stock and the 1,179,050 shares of such stock which the parties have agreed were available for sale by the joint venture unless it is assumed that the excess of 179,050 was attributable to sales and repurchases by the joint venture. ↩
4. Elliott testified that he had to get extensions for the joint venture's 1956 return in order to obtain more time to assemble the required data. ↩
5. There is a $10 discrepancy between the total sales expense actually allowed by respondent and the total of the individual items of sales expense allowed as stipulated by the parties. The opinion has not made any adjustment on account of such discrepancy. ↩
6. The joint venture received $250,000 from General Tire & Rubber Co. pursuant to their July 3, 1956 agreement. The joint venture only reported $187,500 of such payment on its 1956 return because $62,500 of such payment was credited to the account of Walter Ornstein who withdrew from the joint venture on November 2, 1956. Thus, Martin Rodman's share was 2/9ths of $187,500. ↩
7. The differential of $400 between the total amount claimed by Martin on his 1959 return in connection with the Unger & Martin judgment and the total now stipulated to have been paid remains unexplained. ↩