Norman and Arlene **RODMAN** et al., Appellants-Cross-Appellees,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Appellee-Cross-Appellant.

**Nos. 581, 1121, Dockets 75–4211, 75–4239.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1976.

Decided Sept. 17, 1976.

Philip Shurmen, New York City (Paul H. Frankel, Oceanport, N.J., of counsel), for appellants-cross-appellees.

David English Carmack, Tax Div., Dept. of Justice, Washington, D.C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Ernest J. Brown, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for appellee-cross-appellant.

Before LUMBARD, WATERMAN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge.

This appeal arises from several transactions of a joint business venture ("the joint venture") involving Norman ("Norman"), Martin ("Martin") and Robert ("Robert") Rodman, Sydney Newman and Walter Ornstein as the joint venturers. After the Commissioner of Internal Revenue ("Commissioner") had asserted deficiencies and penalties against Norman and Arlene Rodman, Martin and Phyllis Rodman, and the Estate of Sydney Newman and the decedent's wife, Dorothy, for the years 1956, 1957, and 1959 through 1962, and against Robert and Gertrude Rodman for the years 1956, 1957, 1960 and 1962, the tax court, Quealy, *Judge*, made determinations of deficiency which Norman and Arlene Rodman appeal with respect to tax years 1956 and 1957, which Martin and Phyllis Rodman appeal with respect to years 1956, 1957 and 1959 through 1962, which the Estate of Sydney Newman and the decedent's wife Dorothy appeal with respect to tax years 1956 and 1957, and which the Estate of Robert Rodman and the decedent's wife Gertrude appeal with respect to tax years 1956 and 1957. The Commissioner has taken a protective cross appeal involving each of the appellants' 1957 tax years. The tax court's opinion, T.C.Memo. 1973–277, is reported at 32 T.C.M. 1307 (1973).

As did the tax court, we shall take up first the claims which apply to the joint venture as a whole and then address the various claims raised by the appellants as individuals. Generally, the points raised on appeal are that the tax court erred when it (1) disallowed the inclusion of an allegedly unconditional $900,000 debt as part of the cost of certain shares of stock owned and traded by the joint venture, (2) characterized a payment of $250,000 received by the joint venture as ordinary income, (3) disallowed certain of the joint venture's alleged business expense deductions, (4) characterized as a capital loss to its members the loss that apparently accrued when the joint venture terminated, (5) allocated to Martin Rodman his share of the joint venture's income based upon the entire calendar tax year even though he joined the venture only in November, and (6) denied the joint venturers' wives the benefits of "innocent spouse" status. We affirm the tax court's judgment in all respects except its allocation of a full year's share of income to Martin Rodman, which allocation we reverse. Because each of the issues raised rests upon different factual footings, the facts germane to each issue will be treated separately.

## I. *The $900,000 Debt*

In 1955 Ornstein, Newman, Robert and Norman entered into a joint venture, the initial objective of which was to attempt to acquire control of A.M. Byers Company, Inc. ("Byers"). By 1956, however, having lost its bid to gain control of Byers, the joint venture's primary activity became trading publicly the stock of Torbrook Iron Ore Mines, Ltd. ("Torbrook"), a Canadian company incorporated in 1956 to promote prospecting licenses issued by the Nova Scotia Minister of Mines. During 1956 the joint venture acquired 1,179,050 Torbrook shares and realized $2,574,903.34 from sales to the public of 835,055 of those shares.

The dispute in the tax court and now on appeal focuses upon the cost of 500,000 of the Torbrook shares that the joint venture, which used the accrual method of accounting, allegedly purchased from one Aurele Brisson, a Montreal attorney who died in 1970. At the time of Torbrook's incorporation in early 1956, Brisson had subscription rights to the 500,000 shares for a stated consideration of $100,000, that is, 20 cents per share. There was no proof, competent or otherwise, that Brisson actually owned the shares introduced at the trial, however, other than a letter written by Robert in May, 1956, on behalf of the joint venture. In that letter Robert confirmed an alleged agreement between Robert and Brisson, whereby Brisson agreed to sell and Robert agreed to purchase the 500,000 shares for the joint venture for the stated consideration of 21 cents per share ($105,000) plus 20 percent of any additional shares of Torbrook stock that the joint venture might acquire in the future.

At the trial, Norman Elliot, the joint venture's accountant, testified that the May 1956 agreement with Brisson first came to his attention in September of that year and that he suggested that the open-ended 20 percent contingent liability be replaced by a definite liability of a fixed amount. Upon request, Elliot drafted a letter to Brisson to be signed by Robert proposing that Brisson cancel the 20 percent agreement and accept in its place a $900,000 non-interest-bearing note payable on November 15, 1960.[1]

1. The letter provided in full as follows:
    Dear Mr. Brisson:
    By agreement last May, I undertook to transfer to you, without cost, twenty percent (20%) of any additional shares of the capital stock of Torbrook Iron Ore Mines Limited which I might acquire in addition to the shares sold by you to me, and further subject to any escrow agreements restricting our receipt or possession of the shares.

We have since acquired, including the rights to purchase Leroux stock in escrow, approximately 1,400,000 shares of which 900,000 has not as yet actually been stock available to us.
    You know, and we know that problems of mining, company control and general money requirements to see Torbrook off to a really good start may take as much as four years. We therefore wish you to cancel that agreement, and instead, accept a non-interest-

The next time Elliot saw this letter was in May, 1957, when he was preparing the joint venture's 1956 information return. The letter then bore the date "November 3, 1956" and contained signatures purporting to be those of Robert Rodman and A. Brisson.[2] Together with the letter, Elliot received a photocopy of what purported to be a note also dated November 3, 1956, by which Robert promised on behalf of the joint venture to pay Brisson the sum of $900,000 on November 15, 1960. Based upon these documents, Elliot accrued on the joint venture's return the sum of $900,000 as part of the cost to the joint venture for the Torbrook stock.

Upon this evidence, the appellants asserted at trial that an unconditional debt of $900,000 to Brisson had been proved and should be included in the cost of Torbrook stock in accordance with the principle enunciated in *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). The Commissioner, however, contended that the authenticity of the documents had never been demonstrated and further that there was significant evidence to show that the note had never been delivered to Brisson, and that it was never intended that the

joint venture would incur a bona fide unconditional debt to him. It is noteworthy that the original of the November 3, 1956, note and a letter from Brisson to Robert, dated January 7, 1957, were discovered among Sydney Newman's effects at his death.[3] The letter acknowledged receipt from Robert of 200,000 Torbrook shares in full satisfaction of the $900,000 debt. The appellants conceded, however, that the 200,000 shares of Torbrook were never delivered to Brisson.[4] Taking the record as a whole, the tax court found that "there was at no time a definitive obligation to Brisson upon which to predicate the accrual of a liability on the part of the joint venture." 32 T.C.M. 1318.

Although the appellants now attempt to characterize the tax court's decision as a departure from the *Crane* doctrine, it is clear that the decision was no more than a factual finding by the court that the appellants had failed to sustain their burden of proving the existence, the bona fides and the unconditional nature of the $900,000 debt. As a factual finding, the tax court's decision must, of course, be upheld on appeal unless that finding is "clearly erroneous." *Commissioner v. Duberstein*,

---

bearing note for $900,000 from us, with a due date of November 15, 1960. We agree to advance you sums of money from time to time, at our discretion and within our financial means, in partial and earlier payment of this note, and will settle any remainder on the final due date specified.

On your part, and in return for this settlement, you agree not to purchase or sell shares of Torbrook Iron Ore Mines Limited during that period and to do nothing that would prejudice the position of that company or ourselves with respect to the market position of that company's stock, or its finances or ours, and that you will not in any way profit, directly or indirectly, from that company's operations or dealings except upon our express written prior consent. Any violation of this undertaking, however trivial, shall operate to cancel the unpaid balance of the note.

We herewith hand you the note and request that you indicate your acceptance of the above terms and the note by your signature below.

Very truly yours,

Accepted:     */s/ Robert Rodman*
              Robert Rodman, as agent
*/s/ A. Brisson*    for himself and associates
A. Brisson

2. The signatures on the letter were not authenticated at trial.

3. Again, the signature on this letter was not authenticated.

4. The Commissioner has also taken the alternative position that if the $900,000 debt was an unconditional obligation properly accrued in 1956, the January 7, 1957, letter, together with the purported return of the note without payment of the 200,000 shares to Brisson, was a forgiveness of indebtedness and thus income of $900,000 to the joint venture in 1957. Because we agree with the tax court and the Commissioner that the bona fides of the debt were not sufficiently proved, we need not decide the issues raised by the Commissioner's alternative position and his protective cross-appeal based upon that position.

363 U.S. 278, 290–91, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). There is nothing in the record to indicate that the finding was erroneous, much less clearly erroneous. Indeed, the mere fact that there was no authentication of the documents upon which the appellants base their contention would in itself suffice to uphold the tax court's finding. In addition, however, there was no proof that the original note had ever been delivered to Brisson. That latter failure, together with the proof of possession by Newman of both the original note and the January 7, 1957, letter from Brisson, which obviously misrepresented the facts with respect to the satisfaction of the debt, certainly casts a shadow over the bona fides of the entire transaction. In short, the record clearly supports the tax court's finding that the joint venture owed no definitive obligation to Brisson with respect to the purchase price of the Torbrook stock in question.

## II. *The $250,000 Payment*

As discussed above, the joint venture's initial activity involved an attempt in 1955 to gain control of the management of Byers through proxy solicitations. The joint venture's major competitor in the proxy fight was General Tire & Rubber Company ("General Tire"). In 1956, the joint venture lost the proxy battle and entered into an agreement with General Tire, which agreement resulted in the payment of $250,000 from General Tire to the joint venture. The issue in the tax court and now on appeal is whether that payment should be characterized as a capital gain or as ordinary income to the joint venture. The tax court determined that the entire payment was ordinary income to the joint venture. We agree.

In return for the $250,000 payment, the joint venture agreed, in pertinent part, to the following consideration: (1) to accept an offer by General Tire, if made, to exchange the 25,000 shares of Byers stock "owned or controlled" by the joint venture for General Tire stock ("the option"), (2) to assign to General Tire all of the joint venture's right, title and interest in a pending patent application concerning a rubber bellows pump ("the patent"), (3) to assign to General Tire the joint venture's claims against Byers resulting from expenses totalling in excess of $380,000 allegedly incurred by the joint venture in connection with the proxy solicitations, and (4) to refrain, for a five year period, from opposing or hindering General Tire in its attempt to gain control of Byers.

In its 1956 information return, the joint venture characterized the $250,000 payment as a long-term capital gain from the sale of the patent application.[5] The trial in the tax court proceeded upon that assertion. Later, in their brief to the tax court after trial, the appellants further asserted that the payment was also made for General Tire's option to purchase the Byers stock owned by the joint venture, which option apparently was later exercised by General Tire. The appellants reasoned that under both theories the payment was an exchange for a capital asset and hence should be treated as a capital gain. The Commissioner determined that the entire payment was to secure the joint venture's acquiescence in General Tire's further efforts to gain control of Byers and to extinguish the joint venture's claim for reimbursement for proxy expenses. The tax court, finding that the appellants had failed to prove what portion of the payment, if any, should be allocated to the patent or the option, sustained the Commissioner's determination.

■ At the outset, we note that appellants' assertion that part of the $250,000 payment was attributable to the purchase of the option is an assertion that was not timely raised in the tax court. Appellants' contention at trial was that the payment was attributable solely to the patent appli-

**5.** The joint venture in fact reported as capital gain only $187,500 from the transaction because it credited the remaining $62,500 to Ornstein since that transaction had been fully completed before he withdrew from the venture on November 5, 1956. *See* Section VI, *infra*. We shall use the full $250,000 figure in our discussion here for the sake of convenience since only the characterization of the payment and not its amount is in issue.

cation. It was not until after trial that they argued in their brief that the payment constituted consideration for the option. It is well settled in the tax court that an issue raised for the first time in briefs after trial is not timely raised. *William E. Robertson*, 55 T.C. 862, 864–65 (1971); *Sidney Messer*, 52 T.C. 440, 455 (1969); cf. *Guild v. Commissioner*, 543 F.2d 425 (2d Cir. 1976). The tax court nevertheless considered the claim but found the appellants had failed to prove what value, if any, should be placed on the option for the purpose of allocating a portion of the payment to it. In fact, the record fails to show even that the joint venture owned all of the 25,000 shares of Byers stock for which it had granted the option.

The tax court found a similar, if not a more serious, lack of proof with respect to the value of the patent application. The sole evidence in the record with respect to the patent application is a stipulation of certain facts recited below, certified copies of recorded assignments of rights in the patent and the agreement between General Tire and the joint venture. The stipulation provided that patent application # 363362 was filed on June 22, 1953, with the United States Department of Commerce, that the application was rejected and restricted on April 28, 1954, that an amended application was filed October 28, 1954, and again rejected on April 17, 1956, that a further amendment was filed on October 26, 1956, and rejected again on December 6, 1956, that yet another amendment was filed on June 5, 1957, that a notice of claim allowance was filed with respect to six of the seventeen claims on June 12, 1957, and finally that the application was forfeited for failure to pay the final filing fee. The first assignment of rights in the patent was made on August 7, 1953. On that occasion, James J. Sunday, the inventor of a "FLUID PUMP," the subject of the patent application, assigned all his right, title and interest in the invention and the patent application to Newman for "One Dollar ($1.00) and other good and valuable consideration." On September 22, 1953, for the same stated consideration, Newman assigned an undi-

vided one-fourth interest to each of Ornstein, Robert and Norman. There was no further evidence on the issue.

The tax court noted that part of the $250,000 payment may have been allocable to the assignment of the patent application to General Tire, but concluded that the absence of any proof of the value of the application prevented it from making an allocation.

■ It is rather clear from the tax court's opinion that it was not convinced by appellants' argument that the bulk of the $250,000 payment was made by General Tire for any reason other than to end the acquisition battle and to extinguish the joint venture's proxy expense claim. Given the state of the record here, we cannot fault the tax court's factual determination. Generally, where a transaction involves the sale of both capital assets giving rise to capital gains treatment and other assets giving rise to ordinary income, an allocation between the two categories within the transaction is necessary. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Commissioner v. Ferrer*, 304 F.2d 125, 135 (2d Cir. 1962). Neither the Commissioner nor the tax court is required to accept the allocation suggested by the taxpayer but should make such an allocation based upon the relative value of each item transferred as it relates to the whole of the transaction. *F. & D. Rentals, Inc. v. Commissioner*, 365 F.2d 34, 40 (7th Cir. 1966).

■ In essence, the appellants in the instant case attempted to allocate the entire payment to the patent in spite of the fact that the agreement clearly transferred to General Tire ordinary income rights in addition to the patent; however, they presented no evidence as to the patent's value. Thus, there was no evidential basis upon which the tax court could make the allocation based on the relative values of the items. As a result, the tax court apparently felt compelled to sustain the Commissioner's allocation based upon the presumption that his allocation was correct and must be sustained unless the taxpayer shows that it is

"plainly arbitrary." See *Id.* at 40–41. Regardless of any presumption favoring the Commissioner's allocation, the record demonstrates that the patent application was, as asserted by the Commissioner, virtually worthless. Not only had the patent application been rejected prior to General Tire's acquisition of it, but General Tire abandoned it shortly thereafter by failing to pay the required filing fees. It is certainly unlikely that General Tire would have paid such a substantial sum for such a tenuous patent application.

Furthermore, appellants have not attempted to show that the patent application was a capital asset as defined in § 1221 of the Internal Revenue Code of 1954 (the "Code"), 26 U.S.C. § 1221, or even that it was property used in a trade or business entitled to capital gain treatment under certain circumstances as set forth in § 1231 of the Code, 26 U.S.C. § 1231. Rather, appellants make the bold assertion only that the joint venture was entitled to long term capital gains treatment through the special provisions of § 1235 of the Code, 26 U.S.C. § 1235,[6] which generally provides such treatment for the transfer of a patent or patent rights by a "holder" of the patent or its rights. There is, however, nothing in the record to indicate that any of the joint venturers satisfy § 1235(b)'s definition of a "holder." That definition requires that in order to be a holder one must be an individual (1) whose efforts created the invention, or (2) who acquired his interest in exchange for money or money's worth paid to the creator prior to the invention's having been reduced to actual practice if that individual is neither the employer nor a relative of the creator.

■ Because a joint venture is not an individual, it cannot itself be a "holder," Treas.Reg. § 1.1235–2(d)(2); *Burde v. Commissioner*, 352 F.2d 995, 998 (2d Cir. 1965). Although the individual members of a joint venture may be accorded such status, on the record in the tax court only Newman can claim that he paid any consideration to Sunday, the creator of the invention, for the first assignment. Even his unstated claim of entitlement to "holder" status is incomplete, however. There is no evidence that any consideration was paid prior to actual reduction to practice of the invention; in fact, the venture reported a zero basis for the patent in its 1956 return. Also, there was no evidence with respect to whether or not Newman was Sunday's employer. Without such proof, we fail to see how § 1235 is applicable in this case or upon what other basis appellants hoped to establish that the transfer of the patent entitled them to capital gains treatment.

### III. *Business Expenses*

■ During the tax year 1956 the joint venture reported receipts in excess of $2.5 million from the public sale of the Torbrook stock. In that year it claimed as ordinary and necessary business deductions sales expenses in the amount of $124,804.19 and travel and investigation expenses in the amount of $9,445.56. For 1957, in which it reported like receipts of $160,301.97, the joint venture claimed the following business

---

6. 26 U.S.C. § 1235 provides, in pertinent part, as follows:

(a) General.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) "Holder" defined.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d) ).

deductions on its return: sales expenses of $40,793.90, travel and investigation expenses of $7,688.98, commissions of $2,700.00, and legal and accounting expenses of $64,053.88. The Commissioner disallowed all of the disputed expense deductions for 1956 except $2,759.83 for travel and investigation. For 1957, he disallowed all of the claimed commissions and travel and investigation expenses, all but $517.52 of the sales expenses and all but $2,836.00 of the legal and accounting expenses.

At trial, the appellants offered no competent evidence to indicate that any of the disallowed expenditures had in fact been made. The sole evidence bearing upon these expenses was the testimony of the joint venture's accountant, Mr. Elliot. He testified that when he prepared the joint venture's 1956 and 1957 returns, he would have required substantiation of the expenditures sufficient to satisfy himself of their authenticity before entering the figures on the returns. There was no testimony regarding the purpose of any of the particular expenditures. None of the principals of the joint venture who had personal knowledge of any of the disallowed expenditures testified, nor was any documentary evidence introduced to support any of the costs. Consequently, because no evidence was introduced, the tax court sustained the Commissioner's disallowances on the ground that there had been a failure of substantiation.

Appellants' contention in this Court is that the tax court should have estimated a reasonable figure for the claimed deductions and should have allowed that amount to be deducted. In justification for their failure to introduce any documentation, the appellants explain that all such documentation had been lost as a result of the passage of 17 years between the years in question and the tax court trial, as well as the deaths of two of the principals involved. They cite the well known decision of this Court, *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir.

1930), in support of their position that the Commissioner may not arbitrarily deny all deductions simply because those deductions are not documented. We disagree with the contention that the *Cohan* rule is applicable here and affirm the tax court's disallowance of the deductions.

In *Cohan v. Commissioner, supra,* the famous theatrical producer, George M. Cohan, testified at trial that he had spent substantial sums of money travelling and entertaining actors, employees and drama critics in furtherance of his theatrical production business. He could not substantiate by records the actual amounts of such expenditures but instead estimated the amounts in his testimony. The Board of Tax Appeals found that Cohan had made substantial expenditures and that those expenditures were allowable expenses, but denied any deductions on the ground that, in the absence of details, it was impossible to determine his actual expenses. This Court remanded with instructions that the Board "make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Id.* at 544. Much of this Court's reasoning was based upon the fact that the Board's finding that allowable expenses had been incurred was inconsistent with its denial of any deductions at all.

The instant case presents quite a different situation. Here there is no competent evidence that any business expenditures over and above those allowed [7] by the Commissioner were ever made. There was no tax court finding that the disputed expenditures were made, nor was there a finding that they were allowable. Consequently, this is not a case where there is a reasonable certainty that there were *valid* expenditures, with only the amount still in question. *In re Sperling's Estate*, 341 F.2d 201, 202 (2d Cir. 1965). Judicial attempts to ameliorate the harsh results of a strict requirement that taxpayers account for every

7. As mentioned in the text, the Commissioner did not disallow all of the claimed deductions. For example, Martin did testify with respect to certain travel expenses and other expenses incurred in Calgary. Part of the travel and all of the other Calgary expenses were allowed by the Commissioner. See *Henry B. Kelsey.* T.C. Memo 1968–62, 27 T.C.M. 337 (1968).

penny of deductions have not and cannot be stretched to the extent that taxpayers may merely claim deductions on their returns and, without further proof, expect the tax court to allow a reasonable deduction based upon the nature of the taxpayers' businesses and the amounts of their receipts. Regardless of the *Cohan* rule with respect to *amounts* allowable, the courts have consistently held that at least the *existence* of an expense must be proved before any deduction can be taken. E.g., *New Colonial Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). The appellants failed to do so here.

■ The failure of proof cannot be excused merely because the joint venture's records may have been lost or destroyed or because members of the venture have died. *Cf. Hague Estate v. Commissioner,* 132 F.2d 775, 776 (2d Cir. 1943).

## IV. *The 1958 Losses*

On March 19, 1957, the joint venture's sales of Torbrook stock to the public in the United States came to an abrupt halt. On that date the United States District Court for the Southern District of New York, upon complaint of the Securities and Exchange Commission ("SEC"), enjoined Newman and Robert from trading in Torbrook stock until that stock was registered with the SEC. Subsequently, in 1958, the joint venture's entire inventory of Torbrook stock became worthless. The Commissioner conceded as much and allowed the joint venture a net operating loss, the distributive shares of which loss were available to be carried back to the individual members' 1955 and 1956 tax years pursuant to § 172 of the Code, 26 U.S.C. § 172.

After the trial in the tax court, however, the appellants individually contended that they were entitled to further net operating

loss carrybacks and carryovers because the joint venture itself, and each of the appellants' interests in it, had been abandoned when it became apparent that the entire Torbrook joint venture was worthless. Their contention was that when the joint venture terminated, each member's interest became worthless and resulted in further individual net operating losses. The tax court rejected the appellants' application to reopen the record in order for each member to prove his adjusted basis in the joint venture and denied the further net operating losses on the theory that the appellants had not shown that the termination of the joint venture created an ordinary rather than a capital loss for each of the participants. We agree that the appellants have failed to show that they are entitled to ordinary losses and therefore find no abuse of the tax court's discretion in refusing to reopen the record.

■ It is well settled, and there is no dispute between the parties, that for tax purposes a joint venture is treated as a partnership.[8] Sections 761(a) and 7701(a)(2) of the Code, 26 U.S.C. §§ 761(a) and 7701(a)(2). Further, there seems to be no dispute that the partnership terminated in 1958 within the meaning of § 708(b)(1)(A) of the Code, 26 U.S.C. § 708(b)(1)(A), because no part of the partnership's "business, financial operation or venture  . . . continue[d] to be carried on by any of its partners in a partnership." To that extent, it seems clear that a distribution to the partners of solely cash, uncollected receivables, and appreciated inventory made by the partnership at its termination would be a distribution in liquidation of the partners' interests, *see* § 761(d) of the Code, 26 U.S.C. § 761(d), and a loss engendered by such a distribution would be recognized under § 731(a) of the Code, 26 U.S.C. § 731(a),[9] as

---

**8.** Consequently, for the sake of clarity, the joint venture will hereinafter be referred to as "the partnership."

**9.** 26 U.S.C. § 731(a) provides as follows:

(a) Partners.—In the case of a distribution by a partnership to a partner—

(1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution, and

(2) loss shall not be recognized to such partner, except that upon a distribution in liquidation of a partner's interest in a part-

a loss from the sale or exchange of the partnership interests of the distributee partners. Finally, § 741 of the Code, 26 U.S.C. § 741,[10] provides that any such loss recognized to a partner shall be considered as a loss from the sale or exchange of a capital asset, except to the extent that the property distributed was substantially appreciated inventory and unrealized receivables. See § 751 of the Code, 26 U.S.C. § 751.

Given this general statutory framework, the appellants argue that because the entire venture was abandoned, there was no liquidating distribution, hence no deemed sale or exchange of a partnership interest, and no capital loss treatment. *Zeeman v. United States*, 275 F.Supp. 235, 253 (S.D.N.Y.1967) (relying upon § 165(c)(1) of the Code, 26 U.S.C. § 165(c)(1)), *aff'd and remanded on other issues*, 395 F.2d 861, 865 (2d Cir. 1968). The Commissioner's position is that the appellants have not proved the lack of a distribution upon termination and further that, even if there had been no distribution, because there was no partnership property available to distribute, the resulting loss at termination would nevertheless be a capital loss.[11] The Commissioner requests that we overrule the district court's handling of the matter in *Zeeman*. See Rev.Rul. 76–189, I.R.B. 1976–20, where the Commissioner set forth his position subsequent to the oral argument on this appeal. We need not reach the Commissioner's second argument; we agree that there is no proof that there was a total abandonment of the partnership without some type of distribution.

Appellants' entire argument is based upon the premise that when the partnership terminated, there was a total abandonment or forfeiture similar to those treated in *Gaius G. Gannon*, 16 T.C. 1134 (1951), and *Palmer Hutcheson*, 17 T.C. 14 (1951). In those cases, both of which were decided prior to the enactment of the partnership provisions contained in the 1954 Code, the taxpayers received absolutely nothing in return for relinquishing all of their rights in their respective partnerships. In the instant case, however, it is surely possible to conclude from the facts presented in the record that when the partnership terminated, there was cash in its coffers and that some of that cash was distributed to the partners at that time.[12] The record shows, and the appellants have admitted in their brief,[13] that "huge" amounts of income

nership where no property other than that described in subparagraph (A) or (B) is distributed to such partner, loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership over the sum of—

(A) any money distributed, and
(B) the basis to the distributee, as determined under section 732, of any unrealized receivables (as defined in section 751(c)) and inventory (as defined in section 751(d)(2)). Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.

10. 26 U.S.C. § 741 provides as follows:
   In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

11. The Commissioner has also argued that the appellants have failed to prove that there were

in fact any losses because they have failed to prove their bases in their respective partnership interests. While the Commissioner's assertion may be true, we shall disregard this possible evidential failure inasmuch as the tax court would apparently have reopened the record to allow for such proof but for its conclusion that any losses caused by the termination of the partnership would have been capital losses.

12. The Commissioner seeks to rely on Treas. Reg. § 1.708–1(b)(1)(iv) for the proposition that if a partnership is considered to be terminated, all of the partnership's property is "deemed" to be distributed to the partners. We think such reliance is unnecessary where a partnership is admittedly terminated and its business wound up within the meaning of § 708(b)(1)(A) of the Code, and further that such reliance is misplaced in such a situation because, by its terms, § 1.708–1(b)(1)(iv) applies only "[i]f a partnership is terminated *by a sale or exchange of an interest*" (emphasis supplied).

13. Appellants' br. p. 48.

were earned by the partnership in 1956 from the sale of Torbrook stock. There is no proof in the record that any of that "income" was distributed to the partners at that time or in 1957. Indeed, it is more than reasonable to conclude that much of that "income" was retained and reinvested elsewhere by the partnership. In its 1958 information return, the partnership reported proceeds of $185,880.40 from the sale of capital assets, the lion's share of which assets had all been purchased in 1957, and expenses of only $15,267.12. Although those reported transactions produced a reported net long term capital gain of only $91,-713.81, there is no indication that any of the assets had been purchased on margin, and one can easily see that the proceeds were at least presumptively available for distribution when the partnership terminated. Appellants make much of the fact that the tax court mentioned in its opinion that $100,000 of a $120,000 liability of the partnership, properly accrued as part of the basis of the Torbrook stock in 1956, had gone unpaid as a result of "developments" in 1957. From that statement they argue that there were unpaid partnership liabilities at its termination, and thus attempt to negate the possibility that the partnership had any assets available for distribution at that time. We find that argument to be unconvincing in light of the equivocal nature of the tax court's statement and in light of the proceeds from the sale of the capital assets reported in 1958 in excess of that liability. There is certainly no indication in the record that if in fact there was property available for distribution, any of the partners would or did walk away from the partnership without taking his share.

In sum, it is altogether clear that the appellants have failed to prove that there was a forfeiture at all. Unless the partners can show that they received no distribution [14] of partnership property at the partnership's termination, Sections 731 and 741 apply by their very terms and in all

likelihood would convert any loss to a capital one.

It should be stressed that there are several other factual possibilities that could be inferred from the record as presented to this Court. There could, for example, have been so-called "hot assets," namely, unrealized receivables or appreciated inventory included in the partnership property distributed, see § 751 of the Code, 26 U.S.C. § 751, in which case ordinary gain or loss principles would have applied to the extent of the distribution of such assets. On the other hand, there may have been other property, such as office equipment, distributed along with cash and other property, in which case it would appear that no loss would be recognized at all on the distribution itself. Section 731(a)(2) of the Code, 26 U.S.C. § 731(a)(2). These possibilities merely serve to point out the inadequate state of the evidence upon which the appellants sought to convince the tax court to reopen the record. It was certainly no abuse of discretion for the tax court to refuse to reopen the record after a protracted trial where the appellants did not even show that they were entitled to ordinary losses if § 741's capital loss provision were inapplicable.

## V. The Partners' Allocation of Income

The partnership (joint venture) was, as mentioned above, begun in 1955. The original partners (venturers) at its inception were Ornstein, Newman, Robert and Norman, each of whom owned a twenty-five percent interest. On November 2, 1956, however, Ornstein sold his share to the remaining three, each of whom then had a one-third interest in the partnership. Three days later, pursuant to an agreement dated November 5, 1956, Martin acquired a two-ninth's interest, one-ninth from Robert and one-ninth from Norman, with the result that from that date until the venture's termination, Newman retained a one-third

---

14. As mentioned in the text, we have not reached the Commissioner's second argument and do not mean to imply that if indeed the appellants had proved a complete forfeiture they would necessarily be entitled to an ordinary loss. *See Andrew O. Stillwell*, 46 T.C. 247, 252 n.5 (1966).

interest and Robert, Norman and Martin each held a two-ninth's interest.[15]

In its 1956 partnership return, the partnership attributed to Martin a full two-ninth's share of the entire year's reported loss. On his personal return for that year, Martin also reported his share of the loss on a full year's basis. When the Commissioner disallowed the accrual of the alleged $900,000 Brisson debt, however, 1956, rather than being a loss year, showed substantial taxable income for the partnership. Based upon the allocation contained in the partnership agreement and returns, the Commissioner asserted that Martin should be taxed on the basis of his share of the partnership's income for the entire year.

At the trial, Martin testified that it had always been the intent of all the partners that he was to share in the profits and losses only to the extent that such profits and losses occurred after November 5, 1956. He contended that he should not be taxed upon income that accrued to the partnership prior to that date.

The tax court relied heavily upon both the filed tax returns and the partnership agreement, which contained no chronological limitation on Martin's interest, to discredit Martin's testimony about the intent of the parties. The court found that in the November 5, 1956 agreement the members had intended to grant Martin a two-ninth's share of the entire year's income and losses. It concluded that the parties' intent was the controlling factor and that Martin was accountable for a full two-ninths of the partnership's income for the entire year. On this issue of the appeal the Commissioner has conceded that the tax court erred. We agree.

The tax court's opinion rested upon the theory that each partner in a partnership must personally take into account his distributive share of the partnership's taxable income and loss, § 702(a)(9) of the Code, 26 U.S.C. § 702(a)(9), that such share may generally be determined by the provisions of the partnership agreement, § 704(a) of the Code, 26 U.S.C. § 704(a), and that partners may amend the agreement and reallocate their shares at any time up to the original date set by statute for filing the partnership return, § 761(c) of the Code, 26 U.S.C. § 761(c); *Smith v. Commissioner*, 331 F.2d 298, 301 (7th Cir. 1964); *David A. Foxman*, 41 T.C. 535, 554 (1964). The tax court concluded that the November 5, 1956 agreement in effect was a modification of the partnership agreement by which the partners retroactively reallocated to Martin a two-ninth's interest in the full year's income and losses. Based upon the statutory framework mentioned above and the factual determination that the agreement had been modified as described, the tax court's final conclusion was that the agreement was controlling and that Martin must be taxed on a full year's basis.[16]

The most significant problem with the tax court's analysis is that it does not distinguish this case, where a new partner has joined the partnership by a transfer of a partnership interest, from the type of modification considered in the *Smith* case, namely, where the existing members of an ongoing partnership agreed to rearrange their shares retroactively. In the instant situation we believe that such a retroactive reallocation necessarily violates the well established prohibition against one taxpayer assigning taxable income to another. *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). In essence, the present case is no more than an assignment by Robert and Norman of a percentage of their interests in the income earned by them as partners prior to Martin's having joined the partnership. *See* Treas.Reg. § 1.708–1(e)(1)(i). As such, not only does

---

15. In the tax court opinion, percentages, rather than fractional shares were used. At the Rule 155 computation hearing following the trial, however, the tax court was informed by the parties that fractional shares were actually used. The final computations were based upon the fractional interests.

16. The tax court did reduce the partnership's income and losses by the amount of such items attributable to Ornstein under § 706(c)(2)(A)(i) of the Code, 26 U.S.C. § 706(c)(2)(A)(i), prior to the reallocation to Martin.

the retroactive reallocation of income to a new partner violate the *Helvering v. Horst* general assignment of income prohibition, it necessarily follows from that conclusion that such an attempted assignment in the partnership agreement also falls within § 704(b)(2)'s caveat that a term in a partnership agreement cannot be controlling for tax purposes where its principal purpose is the evasion of taxes. Consequently, where a new partner is involved in the sale or exchange of a partnership interest, we must disagree with the tax court's conclusion that the intent of the parties, as evidenced by the partnership agreement, is the controlling factor as to whether or not income or losses which accrued prior to the partner's joining may be reallocated to him retroactively.

■ The conclusion we reach also has a statutory foundation. Section 706(c)(2) of the Code, 26 U.S.C. § 706(c)(2),[17] sets forth certain standards to be applied to "close" the partnership year upon the sale of a part or the whole of a partner's interest. Those provisions require that when a partner transfers his entire interest, the partnership year closes as to him. In the instant case, therefore, when Ornstein sold his entire twenty-five percent interest to Newman, Robert and Norman, the partnership year closed as to him and his distributive shares of the partnership's financial affairs were set as of that moment.[18] The transferee partners at that point, Newman, Robert and Norman, each owned one-third inter-

ests in what remained of the partnership's income and loss items described in § 702(a). *See* Treas.Reg. § 1.706–1(c)(2).

■ When Robert and Norman each subsequently transferred to Martin less than their new entire interests, § 706(c)(2)(B) of the code requires that in computing the partnership income and losses attributable to them they must "tak[e] into account [their] varying interests in the partnership during the partnership taxable year." Consequently, because Robert and Norman are required to take into account their varying interests during the partnership taxable year, it is only logical that Martin must do the same. During the partnership year prior to November 6, 1956, Martin had no interest in the partnership. The only logical conclusion to be drawn from the Code's provisions dealing with the amounts of a partnership's income and losses attributable to the parties involved in the sale or exchange of a partnership interest is that Martin had a two-ninth's interest in only those items that accrued after he entered the partnership. To allow partners by modification of the partnership agreement to rearrange their interests over periods of time when no interests in fact existed would be to disregard the provisions of the Code designed specifically to deal with the allocation of partnership income and losses when partnership interests are transferred. We remand for a proper allocation to Martin of his share of the partnership

---

17. 26 U.S.C. § 706(c)(2) provides as follows:
   (2) Partner who retires or sells interest in partnership.—
   (A) Disposition of entire interest.—The taxable year of a partnership shall close—
       (i) with respect to a partner who sells or exchanges his entire interest in a partnership, and
       (ii) with respect to a partner whose interest is liquidated, except that the taxable year of a partnership with respect to a partner who dies shall not close prior to the end of the partnership's taxable year.
   Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary or his delegate, for the period ending with such sale, exchange, or liquidation.

   (B) Disposition of less than entire interest.— The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced, but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interests in the partnership during the taxable year.

18. It seems clear under § 708(b)(1)(B) of the Code that if Ornstein's interest had been a fifty percent interest or greater, the transfer of that interest would have "terminated" the partnership and presumably would have closed the partnership year as to all members.

income based upon the limited time that he in fact had an interest in the partnership.[19]

## VI. *Innocent Spouse Status*

■ The wives of the joint venture members sought relief in the tax court from liability with respect to the asserted deficiencies on the joint returns which they filed with their respective husbands by claiming that they were "innocent spouses" within the meaning of § 6013(e) of the Code, 26 U.S.C. § 6013(e). Although the wives sought such relief, they presented no evidence whatsoever with respect to the issue. More than a full year after the record had been closed in the tax court, the appellants moved to reopen the record to introduce testimony by the wives. The Commissioner objected on the grounds that appellants had had a full opportunity to present evidence, had failed to request that the record remain open and further had failed to give any satisfactory reason for the failure to present the evidence at the original trial. The court denied the appellants' motion. In its opinion, in addition to noting the rather obvious evidentiary failure, the tax court concluded that in none of the questioned tax years had there been an omission from gross income in excess of twenty-five percent of the gross income stated in any of the respective returns and denied the requested relief.

On appeal the appellants question the tax court's decision only with respect to the 1956 deficiencies assessed against the wives.[20] They assert that the disallowance of the accrual of the $900,000 Brisson debt as part of the cost of the Torbrook stock in 1956 resulted in an increase in that year in each of the respective gross incomes in excess of twenty-five percent of the gross income stated in their returns, and they view as an abuse of discretion the tax court's refusal to reopen the record to receive testimony with respect to § 6013(e)'s further requirements.

There was no abuse of the tax court's discretion in its denial of the motion to reopen the record. Subparagraphs (B) and (C) of § 6013(e)(1) clearly require that in order for a spouse to be entitled to "innocent spouse" protection, he or she must show (1) that in signing the joint income tax return he or she did not know or have reason to know of the omission from gross income, and (2) that, "taking into account whether or not [he or she] significantly benefited directly or indirectly from the items omitted and taking into account all other facts and circumstances, it is inequitable to hold" that spouse liable for any deficiency attributable to such omission. Although the issue had been raised prior to trial and appellants' counsel had stated in his opening remarks that the question was in issue, none of the wives testified nor was any reason given at trial for their absence, although counsel did attempt to justify Norman's absence on the ground that he was required to remain in Switzerland for medical reasons. The only evidence at trial even faintly related to subparagraphs (B) and (C) was Martin's testimony that his wife simply signed the joint income tax returns that he placed before her. Given the absence of any further evidence at trial

---

**19.** Both Martin and the Commissioner contend that on remand the share attributable to Martin should be computed simply by multiplying the pro-rata portion of the year during which he owned his interest (57/366) by his two-ninth's interest. See Treas.Reg. § 1.706–1(C)(2). We note, however, that such a simple pro-rata allocation could in many instances result in a prohibited income assignment to Martin if, for example, the substantial portion of the partnership's income accrued prior to November 6, 1956. The record on appeal does not indicate whether or not such is the case, and we leave to the tax court to determine whether or not a simple pro-rata allocation is appropriate in this case.

**20.** Prior to the trial, the appellants had first raised the innocent spouse issue by amended petitions only with respect to tax years 1957 and 1960. The motions to reopen the record on the innocent spouse issue encompassed all of the tax years in question, including 1956. Because the tax court apparently assumed that the issue had been properly raised in the pleadings with respect to all years, the Commissioner does not press the point that the issue was not properly raised there.

it is clear that appellants have failed to prove their case.

Appellants' motion to reopen the record was not made until more than a year had elapsed after the close of the trial. The motion contained the bare allegations that at the time of trial the wives "were either unavailable, sick or aged." There were no affidavits supporting any of these allegations nor were there any explanations as to why counsel had not made the assertions known to the tax court at the time of trial.

"A motion to reopen and hear further evidence is addressed to the sound discretion of the Tax Court, and a denial of such a motion will not be reversed on appeal in the absence of extraordinary circumstances showing a clear abuse of discretion." *Estate of Melcher v. Commissioner*, 476 F.2d 398, 400 (9th Cir. 1973). We see no abuse of discretion here. Unsupported allegations that necessary witnesses "were either unavailable, sick or aged" at the time of trial are not extraordinary circumstances that justify reversing the tax court's decision not to reopen a trial which had ended more than a year earlier.

For these reasons, we affirm the denial of "innocent spouse" protection.

### VII. *Conclusion*

The judgment of the tax court is affirmed with respect to all issues except the allocation to Martin of two-ninths of the partnership's income from the entire 1956 tax year; the case is remanded to the tax court to make the appropriate allocation to Martin.