JOHN THOMAS DOWD, Jr., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dowd v. Commissioner
Docket No. 6481-78.
United States Tax Court
T.C. Memo 1981-283; 1981 Tax Ct. Memo LEXIS 463; 42 T.C.M. (CCH) 33; T.C.M. (RIA) 81283; June 9, 1981
Richard V. D'Alessandro, for the petitioner. Gerald A. Thorpe, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency of $ 3,454.18 in petitioner's Federal income tax *463 for the taxable year 1974. Respondent further determined an addition to tax under section 6653(a) [1] in the amount of $ 172.70. The issues presented here for our decision are: (1) Whether certain checks drawn on the account of petitioner's employer and made payable and cashed by petitioner constitute gross income received by him; and (2) Whether the proceeds of certain other checks similarly drawn represent gross income received by the petitioner for which no offsetting travel expense deduction is allowable and (3) Whether respondent properly invoked the section 6653(a) negligence penalty. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. John Thomas Dowd, Jr. (hereinafter referred to as petitioner or John, Jr.) timely filed a Federal income tax return for the taxable year 1974 with the Internal Service Center, Andover, Massachusetts. At the time of the commencement of this suit, petitioner was a resident of Saratoga Springs, New York. During the taxable year 1974, petitioner *464 was employed by the Intergold Corporation (hereinafter referred to as Intergold), whose offices are located in Albany, New York. The corporation is engaged in the business of buying and selling coins and precious metals. Petitioner's father, John Thomas Dowd (hereinafter referred to as John), is employed by the corporation as its president and owns 50-percent of Intergold's stock. John, Jr., was a vice-president of the corporation from January 1, 1974 through June 30, 1979 and has held a 50-percent interest in the company since February 12, 1974. Petitioner's duties during 1974 consisted mainly of serving as a courier and representative of the company. He would at various times make purchases of inventory, deliver merchandise which had been sold, and make bank deposits, all on behalf of Intergold. Check 1
On February 8, 1974, Intergold issued its check no. 1440 to petitioner in the sum of $ 6,150 drawn on Citibank (Eastern) N.A. account no. XXXXX0138 (hereinafter referred to as Citibank). This check was issued in order to consummate a purchase of silver which John had arranged for Intergold to buy from one Nate Krate of Pittsfield. This transaction, which was described *465 by John at trial, is reflected in Intergold's check register. In the space provided to record the details surrounding the issuance of the check, the following notation is found: For Purch. of 1 bag Frank. Halves
$ 3200 1 bag junk silver
$ 2950
$ 6150
fr. Nate Krate John identified the handwriting as that of his then secretary and bookkeeper, Phyllis Haviland. This purpose is further reflected by an entry in Intergold's disbursements journal. An examination of the check reveals that it was endorsed by John, Jr. and that $ 6.150 was paid out in 50- and 100-dollar bills. John, Jr. immediately took the cash he received to Pittsfield where he purchased the two bags of silver coins from Nate Krate. One bag contained a mixture of various silver coins, or "junk" silver as it is referred to, and the other bag contained Franklin half-dollars. He then brought the coins he had purchased back to the Intergold offices. John, Jr. stated that he retained no portion of the proceeds of the check, nor was any portion utilized for his personal benefit. John further testified that both bags were subsequently resold. An Intergold invoice dated February 11, 1974, shows *466 the sale of one bag of Franklin halves for $ 3,800. This was apparently a cash sale, as no name is shown for the purchaser. John claims that this sale was of the same half-dollars which were purchased from Nate Krate on February 8. An Intergold invoice dated February 18, 1974, reveals the sale of 10 bags of U.S. silver to Federal Coin and Currency for $ 21,200. John claims that one of the 10 bags sold was the other bag purchased from Nate Krate on February 8. Check 2
On May 7, 1974, Intergold issued its check no. 1814 to petitioner in the sum of $ 2,400 drawn on Citibank account no. XXXXX0138. This check was issued in order to consummate a purchase of 48 English gold sovereigns which John had arranged to buy from one Abbie Daniels. The check stub entry concerning this check contains the following notation: "Exh. for cash Abbie Daniels coin pur." [2] This is also reflected by an entry in Intergold's disbursement's journal. *467 An examination of the check reveals that it was endorsed by John, Jr. and that $ 2,400 was paid out in 100-dollar bills. John, Jr. testified that after he cashed the check, he immediately brought the proceeds back to Intergold's office. He further testified that he did not retain any portion of the proceeds nor was any portion used for his personal benefit. John stated that he personally negotiated the purchase from Daniels at his office. The 48 sovereigns were then resold as part of the sale of 1,000 sovereigns to Federal Coin & Currency for $ 49,750, as reflected in an Intergold invoice dated May 15, 1974. Check 3
On May 16, 1974, Intergold issued its check no. 152 to petitioner in the sum of $ 2,700 drawn on Chase Manhattan Bank of Eastern New York, N.A., (hereinafter referred to as Chase Manhattan). John testified that this check was issued in order to provide cash for a deposit into another Intergold bank account which needed cash (the same Citibank account on which checks 1 and 2 were drawn). The check stub entry for check 152 bears the notation "Citibank deposit" and Intergold's disbursement's journal further reflects this purpose. John, Jr. cashed the check *468 in question at Chase Manhattan and then deposited the cash proceeds, along with other money he had previously received from his father, into the Citibank account. A deposit slip for Citibank account no. XXXXX0138 and bearing the account title Intergold Corporation, which John, Jr. identified as being in his own handwriting, shows a deposit of $ 3,500 in currency. The teller's stamp on the deposit slip reveals the date of deposit to be May 16, 1974. Of further interest is a listing which has been scratched out under "checks" but which appears to read "29-71 2/00 00." The Federal Reserve Code on the Chase Manhattan check is 29-71/218: Travel Expenses
In his role as a courier, John, Jr. traveled to New York City or New Jersey 3 or 4 times a week to deliver coins to customers and to purchase coins or pick up coins which had been purchased from Intergold's trading partners. He was occasionally called upon to travel to Stowe, Vermont, to make bank deposits in an account Intergold maintained there. He would generally leave the office during the morning and return in the early evening, the trips typically requiring 8 or 9 hours. He was never required to stay overnight. In the *469 course of his travels, John, Jr., incurred expenses for such items as gasoline, tolls, telephone calls, food, and parking. Apparently it was Intergold's policy to only reimburse its employees for their out-of-pocket expenditures upon the submission of a voucher or a receipt. At trial petitioner introduced copies of receipts totalling $ 55 for such items as gasoline, tolls, and bus fare. Many of the receipts have illegible dates and none identifies the payor. However, both John and John, Jr. claimed that these were all receipts which were submitted by John, Jr. for which he was reimbursed by Intergold. There were other expenses incurred by John, Jr. during 1974 for which he was reimbursed, but apparently those receipts have since been lost. In an effort to substantiate the amount of his traveling expenses incurred during 1974, petitioner estimated at trial that he traveled approximately 30,000 miles during 1974, representing 90 to 100 trips. He testified that he was reimbursed approximately $ 2,000, comprised of $ 1,300 to $ 1,400 for gasoline, $ 400 to $ 500 for tolls, $ 75 to $ 80 for parking, and an indeterminate amount for telephone calls. He was not reimbursed for his *470 meals or his mileage in the Albany area. For transportation, petitioner would normally use one of several automobiles registered to his father but used exclusively by Intergold. He would sometimes travel by bus instead. He also had the use of gasoline credit cards. In his statutory notice of deficiency, respondent determined that petitioner had failed to include in gross income $ 11,250 representing the total amount of the three checks referred to above. Respondent further determined that petitioner's gross income should be increased by $ 2,082.91 to include his travel reimbursements on the theory that he did not make an accounting to his employer for his travel expenses as required by section 274. Respondent also charged petitioner with liability for the 5-percent negligence penalty under section 6653(a). OPINION Petitioner was the vice-president and a 50-percent shareholder of Intergold, a corporation engaged in the purchase and sale of coins and precious metals. During 1974, Intergold issued three checks payable to the petitioner, each of which he cashed. Petitioner claims that he used the proceeds of two of the checks to make coin purchases, and that the third check *471 was used to provide cash for deposit into another account which needed additional funds. Respondent does not accept petitioner's explanation as to the purposes for which the checks were issued and contends that they constitute taxable income to him under the provisions of section 61. As part of his duties, petitioner would frequently travel out of town in order to make purchases, deliver merchandise which had been sold, and to make bank deposits. The trips would generally take 8 or 9 hours, and he was never required to stay overnight. In order to be reimbursed, Intergold required petitioner to submit receipts for his expenditures. He claims that he complied with this procedure each time he was reimbursed, but only presented a very few of the receipts at trial, the bulk of these allegedly having been lost or misplaced. Respondent argues that petitioner must include these reimbursements in his gross income under section 61 since he failed to make an accounting of his travel expenses to his employer as required by section 274. Finally, respondent determined that petitioner was liable for the 5-percent addition to tax under section 6653(a) as part of the underpayment was due to *472 negligence or intentional disregard of the rules and regulations. Petitioner denies liability for the penalty on two grounds: (1) none of the three checks was required to be included in gross income, and (2) assuming arguendo that the substantiation requirements of section 274(d) are applicable, petitioner's failure to comply with those requirements does not provide a basis upon which to invoke the penalty. Issue 1: Unreported Income
As framed by the respondent, resolution of this issue would turn in the main upon whether we choose to believe petitioner's explanation that he was simply acting as a conduit in his capacity as an employee of Intergold when handling the checks in question. Respondent has determined that the sums so received by petitioner represent taxable income to him, and this finding must be sustained unless petitioner is able to prove otherwise. Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that petitioner has satisfied his burden. Petitioner testified that he retained no portion of the proceeds of the first two checks, nor was any portion thereof used for his personal benefit. [3] His testimony was corroborated by his father. No evidence *473 was presented to show otherwise, or to indicate that the events in question were other than as explained. The explanation given for the first two checks is that in both cases the sellers wanted cash. It is easy to understand why the sellers might have been reluctant to part with their merchandise under other arrangements since they were parting with something internationally recognized as having liquidity even greater than many currencies. By the time it would take a check to clear, or perhaps fail to clear, petitioners could have already converted the coins they had received. We feel that petitioner has reasonably and adequately explained the circumstances surrounding the issuance of the checks. Respondent seizes upon the fact that most of the other purchase *474 transactions entered into by Intergold involved checks made payable directly to the sellers. This fact alone is of little help, since familiarity often breeds respect. We cannot know why some customers may have accepted checks from Intergold while others would not. It would seem to be a function not only of the general policies of the seller, but also the nature of their past relationship with Intergold. However, it does seem perfectly natural to us that out of the many persons with whom Intergold deals, some would demand to receive cash. That the number of such persons is not great does not contradict their existence. Respondent faults petitioner for not producing inventory records to link the purchases with the subsequent resales and for failing to obtain a receipt for the purchase. Admittedly, petitioner's small business could have produced better records, and where cash is employed honest doubts may be inevitable. Nevertheless the only issue here presented is whether the coins were purchased. Proof of a subsequent resale of coins said to be those purchased is merely icing on the cake. And the absence of a receipt may simply reflect the fact that to some extent the assets *475 traded were currency for currency. [4]
Additionally, we note that the testimony of petitioner and his father is consistent with and substantiated by the documentary evidence that was introduced. Intergold's check register and disbursements journal reflect the purchases that petitioner testified were made. On the record as a whole, we sustain petitioner. As to the third check, the explanation for its issuance is that a second account needed cash to cover outstanding checks. A direct deposit of a corporate check drawn on Chase into a Citibank account would most likely have resulted in a hold being placed upon the funds until the check cleared. It is possible Citibank would have temporarily covered any outstanding checks by advancing credit to Intergold, but this would depend upon the business relationship between Intergold and Citibank. As John testified at trial, the company did not have the best possible credit arrangements, and getting collected funds was a problem. Intergold feared that their relationship *476 with the bank was not sufficient to chance, and opted instead for a direct cash deposit. In any event, beyond the reason for the need to engage in this series of events, it has been shown that a deposit in the exact amount of the check was made into the Citibank account in the very same day. This negates any inference that the proceeds of the check were retained by the petitioner. As to all three checks, we do not believe that any portion of the proceeds was retained by petitioner or used for his personal benefit. This is consistent with the explanations offered by both petitioner and his father to account for petitioner's endorsement of the checks, as well as the corroborating documentary evidence. Issue 2: Travel Expenses
Petitioner received checks totalling $ 2,082.91 from Intergold, which checks petitioner claims represent reimbursements by his employer for out-of-pocket expenditures made while traveling on company business. No mention of these checks was made on petitioner's Federal income tax return. Respondent determined that the reimbursements should have been included in gross income, and that no deduction on account of these expenses is available. At the *477 outset we must separate the two components of the transaction: the expenditures by the petitioner and the reimbursement by his employer. As to the latter, it is well-settled that any reimbursement by an employer to an employee results in the receipt of gross income by the employee. Rietzke v. Commssioner, 40 T.C. 443, 453 (1963). This is true regardless of whether the employee is entitled to an offsetting deduction. Therefore we examine only the first component in order to determine whether the expenditures by petitioner, if any, were deductible expenses. Only if a deduction was proper was petitioner correct in failing to include the reimbursements in gross income, presuming that, as petitioner claims, the expenditures and the reimbursements were equal in amount and that he was required to and did in fact make an accounting to his employer. See secs. 1.162-17(b)(1), [5] Income Tax Regs.
Consequently, we must determine the deductibility of the claimed expenses as business *478 expenses under section 162. [6] The taxpayer has the burden of proving both the existence of the deductible expenditure as well as his entitlement thereto. Welch v. Helvering, 290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner alleges that the $ 2,082.91 he received represents reimbursement for his out-of-pocket traveling expenses. The evidence presented, however, makes this claim highly dubious. In the first place, the bulk of the expenses was for gasoline--$ 1,300 to $ 1,400. Yet John, Sr. testified at trial that his son used a company car for these trips and also had the use of gasoline credit cards. In view of petitioner's use *479 of these cards, we do not believe petitioner incurred any unreimbursed gasoline expenses. The remainder of the alleged reimbursements were $ 400 to $ 500 for tolls, $ 75 to $ 80 for parking and an indeterminate amount for telephone calls. The only evidence of these expenditures was the testimony of petitioner and his father. [7]
As further support for our conclusion that the entire $ 2.082.91 must be reported in gross income, we point out that no attempt was made to show any correlation between the dates and amounts of the purported travel expenses and the dates and amounts of the checks claimed herein to represent reimbursement. While ordinarily, as described previously, a travel expense deduction could exist apart from an addition to income, in the instant case petitioner himself claimed the two to be mutually interdependent. *480 After a careful review of the record as a whole we simply do not believe petitioner incurred any unreimbursed expenses. There being no factual foundation upon which to premise even an approximation and since the petitioner has not demonstrated that he incurred any unreimbursed expenses, see Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), respondent's determination on this issue is sustained in full. See Rodman v. Commissioner, 542 F.2d 845, 854 (2d Cir. 1976). Petitioner's failure to pass muster under section 162 makes it unnecessary for us to decide whether he must additionally be put to the even stricter substantiation requirements of section 274. Issue 3: Negligence Penalty
Finally we reach the issue of whether respondent properly determined an addition to tax under section 6653(a) which provides that if any part of any underpayment is due to negligence or intentional disregard of the rules and regulations there shall be added to that tax an amount equal to 5 percent of the underpayment. On brief respondent further defined the imposition of the penalty as relating only to the failure to include the proceeds of the February 8, May *481 7, and May 16 checks as gross income. In view of respondent's concession and since we have held that no portion of any of these three checks constitutes gross income to the petitioner, we must dismiss the negligence penalty without passing upon the question of whether failure to substantiate the travel expenses in issue gives rise to the penalty under the particular facts of this case. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. There is also the penciled-in notation: "48 8005 at $ 50.00." John translated this to mean 48 sovereigns at $ 50. A photo-copy of this check, which was made when the stub was presented to the Internal Revenue Service during early 1975 in response to an administrative summons, does not show this penciled-in notation. We therefore feel that the notation was probably not made contemporaneously with the regular check book entries, and we will give no weight to it.↩
3. Although this specific question was not asked of petitioner during discussion of the third check, it is clear from petitioner's account of the events herein that the answer would have been the same. Additionally, respondent does not make a point of this and, in any event, the documentary evidence alone is sufficient to lead us to believe that the third check should not be included, as will be discussed further on.↩
4. We note that there is no evidence that receipts were kept for any of the purchases, yet it would be absurd to deny there were substantial purchases throughout the year.↩
5. We doubt petitioner made an accounting to his employer, since he claimed no unreimbursed expenses on his return, and since the quality of the few documents he produced was negligible.↩
6. Sec. 162(a)(2) states in pertinent part: SEC. 162. @TRADE OR BUSINESS EXPENSES. (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business, * * *.↩
7. Petitioner did introduce into evidence a few documents purporting to be receipts for a negligible part of the deductions claimed ($ 55). Many of the receipts, however, bore illegible dates and none identified the payor. We therefore cannot accept these tendered documents as validation of even a negligible portion of John, Jr.'s purported traveling expenses.↩